**Sa'Da and Tyjuan JOHNSON, minors, by their parent and next friend Felicia JOHNSON, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF CHAMPAIGN UNIT SCHOOL DISTRICT # 4, Defendant.**

No. 00–1349.

United States District Court, C.D. Illinois.

Jan. 29, 2002.

---

Kathleen Mangold–Spoto, Robert C. Howard, Joan Matlak, Carol R. Ashley, Venita Hervey, Futterman & Howard Chtd., Chicago, IL, for Plaintiffs.

Erika Dillon, Patricia J. Whitten, Franczek Sullivan PC, Chicago, IL, for Defendant.

## ORDER

McDADE, Chief Judge.

Before the Court is the parties' Joint Motion for Approval of the Proposed Second Revised Consent Decree [Doc. # 41]. Having conducted a fairness hearing in accordance with Rule 23(e) of the Federal Rules of Civil Procedure on November 13, 2001, and in consideration of the evidence adduced at that hearing comprising several hundred pages of documents and affidavits, the written and oral objections of several third parties, and having reviewed the pleadings in this case, the Court finds that the Proposed Second Revised Consent Decree is fair, reasonable, and adequate to the class. The Court further finds that the Proposed Second Revised Consent Decree meets all applicable legal standards for the entry of consent decrees in general and desegregation consent remedies in particular. The Court makes the following findings of fact and conclusions of law and approves the Proposed Second Revised Consent Decree for the reasons discussed *infra*.

### FINDINGS OF FACT

### PROCEDURAL HISTORY

This action arises pursuant to 42 U.S.C. § 1983 for the deprivation of Plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States, Title VI of the Civil Rights Act of 1964 codified as 42 U.S.C. § 2000(d), the regulations promulgated under the authority of Title VI of the Civil Rights Act of 1964, 34 C.F.R. § 100.3 *et seq.*, 42 U.S.C. § 1981, and the Equal Protection Clause of the Constitution of the State of Illinois. This Court has jurisdiction to hear the claims under 28 U.S.C. § 1331, 28 U.S.C. § 1343(3), and 28 U.S.C. §§ 2201, 2202.

The individual Plaintiffs in this case are African–American public school students

of Unit 4 Champaign Illinois School District.

Defendant, Board of Education Champaign Community Unit School District # 4 ("Unit 4" or "District"), is a body politic and school district of the State of Illinois organized and operating in Champaign County. The Board of Education is charged with and responsible for the operation of the public schools within the District.

In May and July 1996, several African–American families initiated complaints with the United States Department of Education, Office for Civil Rights ("OCR"), alleging race discrimination by Unit 4 schools. In October 1996, the law firm of Futterman & Howard, Chtd., on behalf of African–American students, amended the OCR complaints to include additional allegations of discrimination. CCM ¶¶ 2–3, Bates No. 1.

The initial complaints addressed student assignment and educational services provided to approximately 550 mandatorily bused African–American students. CCM ¶ 2, Bates No. 1.

The amended OCR complaints added four other issues: system wide discrimination in student assignment, within-school segregation practices and tracking, discipline, and staff hiring and assignment. EEM n. 2, Bates No. 12.

In September 1996, OCR initiated a proactive compliance review of Unit 4 to investigate the over-representation of minorities in special education and the under-representation of minorities in upper level courses. OCR also included the areas identified in the parents' complaints as part of their investigation. CCM ¶ 3, Bates No. 1; OCR 1, Bates No. 25.

Following a period of study and community input, the Board of Education of Unit 4 in November 1996 established a redistricting plan ("Redistricting Plan"). CCM ¶ 5, Bates No. 2.

Plaintiffs asserted that the Redistricting Plan did not reduce the disparate impact of educational practices, nor fully resolve their complaints, and that the Unit 4 student assignment system required additional modification to ensure diversity and educational equity. CCM ¶ 6, Bates No. 2.

Accordingly, in or around May 1997, Plaintiffs notified Unit 4 that they were contemplating the commencement of class action litigation against the District challenging, among other things, the student assignment methods used in 1968–97 and the Redistricting Plan. CCM ¶ 6, Bates No. 2.

On September 16, 1997, Unit 4 and Plaintiffs entered into an agreement, memorialized as the Champaign Controlled Choice Plan Memorandum of Understanding (the "Controlled Choice Memorandum"), which established a comprehensive plan and program for addressing Plaintiffs' complaints as to the assignment of African–American students among Unit 4 schools. CCM, Bates Nos. 1–11.

In June 1998, the District completed a comprehensive educational equity audit ("Education Equity Audit") with the assistance of Dr. Robert Peterkin and James Lucey to evaluate the performance of Unit 4 schools. EEA, Bates Nos. 63–162.

On June 15, 1998, the District entered into a Resolution Agreement with OCR resolving both the OCR proactive investigation and the Complaints filed by the African–American families. OCR, Bates. Nos. 25–62.

On July 6, 1998, Unit 4 and Plaintiffs entered into an agreement, memorialized as the Memorandum of Understanding of Civil Rights Issues Relating to Education Equity (the "Education Equity Memorandum"), which established a comprehensive

plan and program for addressing certain additional complaints of Plaintiffs regarding alleged inequitable treatment of African–American students in Unit 4 schools. EEM, Bates Nos. 12–24.

In June 2000, Unit 4 adopted an Education Equity Implementation Plan ("Implementation Plan"), which included timetables and goals to fulfil the Controlled Choice, Equity, and OCR Resolution Agreements. IP, Bates Nos. 163–83.

At the time the OCR complaints were filed, the African–American parents and later Futterman & Howard, were aided in their efforts by the association "Of the People" (OTP), a predecessor of the association "Racial Justice Now" (RJN).

"[A] dispute arose," however, between OTP and Plaintiffs' counsel regarding implementation of the Controlled Choice Plan. 8/16/01 Ct. Order at 2. Thereafter, OTP became RJN. On July 28, 2000, RJN filed a school desegregation case against the School District. Plaintiffs then filed the instant action on October 4, 2000, and simultaneously with the filing of the complaint, submitted the Plaintiffs' and Defendant's Joint Motion for Approval of Consent Decree. Basically, the proposed Consent Decree adopts and incorporates the Controlled Choice Memorandum, the Resolution Agreement with OCR, and the Education Equity Memorandum and Implementation Plan.

RJN sought to intervene in the present case, alleging collusion between Plaintiffs and Defendant School District. The Court on August 16, 2001, denied the motion, finding that RJN had failed to allege sufficient facts to support its charge of collusion. 8/16/01 Ct. Order at 11.

On August 22, 2001, this Court certified the named Plaintiffs in the Johnson case as class representatives and approved Futterman & Howard as class counsel. 8/22/01 Ct. Order.

After proper public notice of the fairness hearing on the parties' joint motion for approval of the consent decree, written objections to the consent decree were received by the Court. See Public Notice, Tab 2 of the Proposed Consent Decree filed 10/15/01.

On November 13, 2001, the Court held a fairness hearing. The parties presented documentary evidence and affidavits in support of or in opposition to the proposed consent decree, and each supplemented the joint presentation with their own additional comments and evidence. In addition, oral objections were heard by the Court by all interested persons wishing to make such objections.

## AGREEMENTS UNDERLYING THE CONSENT DECREE

### A. The Controlled Choice Plan

On September 16, 1997, the parties agreed to implement the Controlled Choice Plan which:

1. Guarantees racial diversity, provides individual choice regarding school enrollment within racial fairness guidelines, and promotes school reform CCM ¶ 9a, Bates No. 3.

2. Ensures equitable access and burdens by allocating the District's total basic school capacity to each part of the city in proportion to the number of students that reside there. CCM ¶ 9f, Bates No. 3.

3. Provides educational opportunities for individual students by permitting each student to choose, from a number of schools in the system, two or more schools that the student desires to attend, and to rank the schools by personal preference. CCM ¶ 9g, Bates No. 3.

4. Contains a flexibility range of a maximum of plus or minus 15% of

those system-wide racial compositions to accommodate schools which are over-chosen by one group and under-chosen by another. The over-choosing group may exceed its fair share proportion within this range. System-wide racial composition and the applicable flexibility range shall be determined independently for elementary, middle, and high schools. CCM ¶ 9j, Bates No. 4.

5. May contain a sibling preference which provides a first preference, within racial fairness guidelines, to all students who have a brother or sister already attending the student's school of choice. CCM¶ 9m, Bates No. 4.

6. Contains a neighborhood preference which provides a preference within racial fairness guidelines to students who can walk to their chosen school. CCM ¶ 9n, Bates No. 4.

7. Creates one or more Parent Information Centers ("PIC") with sufficient resources to perform the day-to-day operations of the Plan and provide outreach, information, and advocacy to parents. The PIC(s) shall be located and conducted in a manner which maximizes minority parent participation in the Controlled Choice Process. CCM ¶ 9o, Bates No. 4–5.

8. Requires all eligible students to fill out an application indicating a minimum of two schools of choice. Every effort will be made to insure that minority students are aware of and participate in the application process. CCM ¶ 9p, Bates No. 5.

9. Addresses over-chosen schools by conducting a lottery after all students with preferences who meet the racial fairness guidelines have been assigned. CCM ¶ 9q, Bates No. 5.

10. Identifies, publicly lists, and provides technical assistance, and if necessary, changes in personnel in under-chosen schools. The purpose of these actions is to upgrade and improve the quality of education received in under-chosen schools. CCM ¶ 9aa, Bates No. 6.

11. Established a community-based Controlled Choice Community Task Force to assist in developing and implementing the Controlled Choice Plan. The Task Force represents the District's racial, economic, civic, governmental, business, and other major constituencies. CCM ¶ 12, Bates No. 7.

The parties formed a Planning and Implementation Committee ("PIC") comprised of an equal number of representatives of each party, including counsel. Throughout the Plan's duration, PIC will continue to monitor, evaluate, refine, and improve the Controlled Choice Plan. CCM ¶ 15, Bates Nos. 7–8.

In the 1998–99 school year, Controlled Choice was implemented at the Kindergarten level in all 11 elementary schools, and is phased in by grade each year thereafter:

| School Year | Grades Affected |
| --- | --- |
| 1998–99 | Kindergarten |
| 1999–2000 | K, first grade |
| 2000–01 | K, 1, 2 |
| 2001–02 | K, 1–3 |
| 2002–03 | K, 1–4 |
| 2003–04 | K, 1–5 |

CCM ¶ 10a, Bates No. 6.

**B. *OCR Resolution Agreement***

To resolve the Complaints filed by African–American parents in May and July 1996 and the proactive review initiated by OCR in September 1996, OCR and the District reached an agreement as to the appropriate actions to be taken by the District to further its commitments to en-

sure that minority students are provided equal access to high standards and a high quality education in accordance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and its implementing regulation at 34 C.F.R. Part 100. OCR 1, Bates No. 25.

To demonstrate its compliance with the OCR requirements, the District agreed to submit annual status reports regarding its implementation of the resolution to OCR. The last annual report is to be submitted to OCR by the District in August 2002. OCR, however, may require reports after August 2002 to the extent that any portion of the resolution is not fully implemented. OCR 37, Bates No. 61.

The OCR resolution includes the following principles and goals:

1.  Students, regardless of race or national origin, must be provided access to high quality curriculum which enables students to achieve high standards;

2.  A school climate which promotes learning and success and encourages students to support each other; and

3.  Development of a diverse staff that will assist in a positive and supportive learning environment for all students. OCR 1, Bates No. 25.

The OCR resolution also includes specific goals and implementation timetables for gifted and upper level courses, discipline, special education, alternative programs, staff hiring, and within-school segregation. These specific elements of the OCR Resolution were incorporated into the Implementation Plan for the Equity Agreement. IP, Bates Nos. 163–183.

## C. *Education Equity Agreements*

On July 6, 1998, the District voluntarily entered into a Memorandum of Understanding ("Education Equity Memorandum") to address educational equity issues. In doing so, the District acknowledged data reflecting disparity between white and African–American students in the District, and sought to improve access and equity in areas cited by Plaintiffs. EEM 1, Bates No. 12.

The Education Equity Memorandum was intended to address elimination of unwarranted disparities with respect to both the availability of educational services to African–American students, and also the participation and performance of African–American students in such services. EEM ¶ 2B, Bates No. 14.

The Education Equity Memorandum includes the following standards:

1.  A standard for participation of African–American students in each of the regular programs, courses, classes and extracurricular activities. EEM ¶ 5A, Bates No. 17.

2.  Standards for reasonably and practicably comparable educational outcomes for African–American and non-African-American students with respect to attendance, grades, standardized achievement scores, alternative assessment scores, discipline rates, and dropout/graduation rates. EEM ¶ 5B, Bates No. 17.

3.  Standards for comprehensive, supplemental educational and social support to African–American students as needed to achieve and maintain the performance standards identified in the Equity Memorandum. EEM ¶ 5C, Bates No. 17.

4.  Standards to eliminate to the greatest extent practicable any over-representation of minority students in subjective special education categories. The District bears the burden of demonstrating that any such over-representation is clearly justified by the application and outcome of valid, nondiscriminatory special education

assessment and placement practices. EEM ¶ 5D, Bates No. 17.

5. Noting the special relationship between discipline and school climate, standards in each area, including systemwide comprehensive multicultural initiatives and staff development programs regarding equitable discipline. EEM ¶ 5E, Bates No. 17.

6. Standards to achieve a substantial level of racial diversity among the District's certified and noncertified staff members systemwide and within individual schools, focusing on recruitment, hiring, assignment and transfer standards. EEM ¶ 5F, Bates No. 18.

The PIC was designated to monitor, evaluate, refine and improve the Education Equity Memorandum. EEM ¶ 3, Bates No. 15.

In June 2000, the District adopted an Education Equity Implementation Plan ("Implementation Plan") to cohesively implement the Controlled Choice, Education Equity and OCR Resolution Agreements. IP i, Bates No. 165.

The purpose of the Plan was to set forth a comprehensive framework for improving the District's educational programs and opportunities in order to "close the achievement gap" between minority and non-minority students. IP i, Bates No. 165.

The Plan identified objectives, established flexible goals and enumerated actions to be performed by the District in the following areas: (1) climate and discipline; (2) special education; (3) gifted education; (4) student performance; (5) Columbia Center and alternative programs; and (6) hiring and staff placement and retention. IP, Bates Nos. 164–183.

The PIC developed the Implementation Plan and the Board of Education adopted it in June 2000. EEA Update 3, Bates No. 350.

## INVOLVEMENT OF EXPERTS IN THIS CASE

Since Plaintiffs began negotiations with the District in 1997, several experts have been involved in analyzing data and developing remedies: Dr. Robert Peterkin, Dr. Michael Alves, and James Lucey. These experts are experienced in school equity issues and have testified or participated in numerous school desegregation cases or have worked extensively with school districts addressing issues of race and equity.

### A. Dr. Robert Peterkin

Dr. Peterkin currently serves as the Keppel Senior Lecturer on Education at the Harvard Graduate School of Education; Chair of Programs in Administration, Planning and Social Policy at the Harvard Graduate School of Education; Director of the Urban Superintendents Program at Harvard University; and as President of the Peterkin Consulting Group. Peterkin 1st Aff ¶ 1, Bates No. A9.

Dr. Peterkin has received numerous awards, participates in numerous professional and community organizations, has published numerous book chapters, articles, papers and reports on educational equity issues, and has been a featured speaker at more than 55 presentations during the last decade to address leadership and educational equity. Peterkin 1st Aff ¶ 2–3, Bates Nos. A9–A10.

Dr. Peterkin has focused his entire career on urban education, with an emphasis on school restructuring, development of school programs for children isolated by poverty, gender or race, and advocacy for equitable school choice. Peterkin 1st Aff ¶ 4, Bates No. A10.

Dr. Peterkin has served as a consultant and expert witness on federal school desegregation cases across the country. Peterkin 1st Aff ¶ 5, Bates No. A10.

In 1997, Unit 4 retained Dr. Peterkin, with assistance from James Lucey, to conduct a comprehensive examination of the District, evaluate the ability of all students to share equitably in the educational opportunities offered, and to make recommendations to the Board to improve and ensure equity. Peterkin 1st Aff ¶ 6, Bates No. A10.

Between July 1997 and June 1998, Dr. Peterkin engaged in extensive data collection and analysis, evaluating all components of the District's educational community, detailed in the Educational Equity Audit. Peterkin 1st Aff ¶ 7, Bates No. A10.

From 1998 to June 2000, Dr. Peterkin continued to conduct various reports and assist the District in developing plans to ensure educational equity. Peterkin 1st Aff ¶ 8, Bates No. A11.

Dr. Peterkin has reviewed the Proposed Consent Decree and has no specific objections to its provisions. Dr. Peterkin generally supports and recommends the provisions contained within the Decree. Peterkin 2nd Aff ¶¶ 2–4, Bates No. A12.

Dr. Peterkin believes that, as set forth in the Decree and the underlying agreements between the parties, the parties have developed a comprehensive program and process to further educational equity for African–American students in Champaign public schools that includes, but is not limited to, involving the community, enhancing student assignment desegregation, furthering educational equity, utilizing the PIC, continuing the collaborative working relationship among counsel for Plaintiffs and the District, and designing provisions to monitor the District's progress toward its goals. Peterkin 2nd Aff ¶ 5, Bates No. A13.

It is Dr. Peterkin's opinion, based on his extensive experience with school desegregation, that the program and process set forth in the Decree increases the probability of success in meeting the Decree's goals. Peterkin 2nd Aff ¶ 6, Bates No. A13.

Dr. Peterkin believes that when, as in this case, both parties voluntarily commit to racial equity initiatives, the likelihood of success in meeting the goals of the Decree increases. Peterkin 2nd Aff ¶ 7, Bates No. A13.

## B. *Dr. Michael Alves*

Dr. Michael Alves is the Senior Educational Planner and Equity Specialist for the Education Alliance and Equity Assistance Center at Brown University. He is also President of the Alves Educational Consultants Group, Ltd. Alves Aff ¶ 1, Bates No. A1.

Dr. Alves has served as a high school teacher, Project Director for State Desegregation Assistance Programs, and Director of the Federal Title IV Civil Rights Act Unit for the Bureau of Equal Educational Opportunity, Office of the Commissioner, Massachusetts Department of Education. Alves Aff ¶ 2, Bates No. A1.

Dr. Alves has extensive experience as an educational consultant and desegregation planner specializing in the design, implementation, and monitoring of "controlled choice" student assignment and school improvement plans. Alves Aff ¶ 3, Bates No. A1.

Dr. Alves has worked on controlled choice plans in more than 27 school districts across the country, including cases where he was retained as an expert witness and controlled choice planner in federal desegregation lawsuits. Alves Aff ¶ 4, Bates No. A2.

Dr. Alves has served as a desegregation planner and consultant to various federal

education agencies and national and local civil rights organizations, including the U.S. Department of Justice, U.S. Department of Education, Office for Civil Rights, NAACP Legal Defense Fund, and others. Alves Aff ¶ 5, Bates No. A2.

Dr. Alves has also served as a policy analyst and advisor on school choice, school desegregation and urban education issues to the National Governor's Association, National School Boards Association, National Education Association, and State Departments of Education (including Illinois); served as a member of the President's National Commission on Children, Implementation Committee on Increasing Educational Achievement; and published more than 47 books, articles, papers and reports on controlled choice and desegregation. Alves Aff ¶¶ 6–7, Bates No. A2.

In 1998, Unit 4 retained Dr. Alves as a controlled choice and student assignment planning expert to develop and implement, with Dr. Robert Peterkin, a Controlled Choice Plan for the District's elementary schools (grades K–5). Alves Aff ¶ 8, Bates No. A2.

Since the 1997–1998 school year, Dr. Alves has advised the District on its implementation of the Controlled Choice Plan in its elementary schools. Alves Aff ¶ 9, Bates No. A3.

## C. *James Lucey*

James Lucey is the Principal Consultant at Lucey Consulting, where he serves as an independent consultant, primarily involved in public school district federal desegregation cases. Lucey Aff ¶ 1, Bates No. A7.

Mr. Lucey has 15 years of previous teaching and administrative experience in local school systems and in state youth service agencies, as well as more than 11 years of previous experience in various Information Technology and Financial Management positions in the private sector. Lucey Aff ¶¶ 2–3, Bates No. A7.

Mr. Lucey has focused his career on data analysis. His area of emphasis is school desegregation cases in which he conducts extensive data analyses, prepares the results, and presents his findings to educational decision-makers, senior organizational staff, politicians, and the courts. Lucey Aff ¶ 4, Bates No. A7.

Mr. Lucey has served as a consultant on federal school desegregation to a number of school districts across the country. Lucey Aff ¶ 5, Bates No. A7.

Unit 4 retained Mr. Lucey in 1997 to conduct a comprehensive examination of the District, evaluate the ability of all students to share equitably in the educational opportunities offered, make recommendations to the Board of Education to improve and ensure equity, and to otherwise assist consultant Dr. Robert Peterkin. Lucey Aff ¶ 6, Bates No. A7.

Between July 1997 and June 1998 Mr. Lucey engaged in extensive data collection and analysis, evaluating all components of the District's educational community, detailed in the Educational Equity Audit. Lucey Aff ¶ 7, Bates No. A7.

Since 1997, Mr. Lucey has continued to conduct various reports and assist the District in developing plans to ensure educational equity. Lucey Aff ¶ 8, Bates No. A7.

## CONDITIONS IN THE DISTRICT

### A. *Student Assignment*

#### 1. *Seat Capacity as of the 1996–97 School Year*

In the 1996–97 school year there were 10 elementary schools in the District. Four were located in the north side of the District and six were located in the south, with University Avenue defining the distinction between north and south Champaign:

| North Side | South Side |
|---|---|
| Columbia | Bottenfield |
| Booker T. Washington | Carrie Busey |
| Garden Hills | Kenwood |
| Dr. Howard | Robeson |
| | South Side |
| | Westview |

Alves 2nd Report 5, Bates No. 343.

Dr. Michael Alves, whom the District retained to conduct the initial audit of the Champaign School District, determined the following with respect to seat capacity in Champaign:

| Geographic Location | No. of Strands | Capacity of Students | K–5 Resident Student Population | Resident Utilization Rate |
|---|---|---|---|---|
| North | 11 | 1,585 | 1,812 | 114.3% |
| South | 18 | 2,590 | 2,421 | 93.5% |

Alves 2nd Report 6, Bates No. 344.

Overall the District's total resident utilization rate for elementary schools was 101.4%. Alves 2nd Report 6, Bates No. 344. Students living in the north were being structurally displaced and assigned to south side schools in the 1996–97 school year. For example, if all the students who resided in the north wanted to attend schools in the north, 227 would not have been able to. All south side students would have been able to attend their area schools. Alves 2nd Report 6, Bates No. 344. See chart below.

### 1996–97 STRUCTURAL DISPLACEMENT

| | Student Population | Capacity | Strands | Utilization Rate | Shortfall/ Excess Capacity |
|---|---|---|---|---|---|
| South Side | 2,421 | 2,590 | 18 | 93.5% | + 169 |
| North Side | 1,812 | 1,585 | 11 | 114.3% | − 227 |

This information indicates that the District needed to increase elementary capacity in both areas of the District. See Alves 2nd Report 6, Bates No. 344 and Alves 2nd Report 9, Bates No. 347.

77.1% of African–Americans resided in the north side and 22.9% resided in the south side. Therefore, according to Dr. Alves, the data strongly suggests that the structural displacement [1] of north side students may have been a major contributing factor to the disproportionate transportation of some 546 African–American students in the 1996–97 school year. Alves 2nd Report 6, 8, Bates Nos. 344, 346.

### 2. Seat Capacity as of the 2001–02 School Year

As of the 2001–02 school year, the District has 11 elementary schools, one more than it had in the 1996–97 school year:

1. Dr. Alves relied on information from a Report prepared by Arlene A. Blank, Champaign School District Assistant Superintendent for

| North Side | South Side |
|---|---|
| Stratton [2] | Barkstall |
| Booker T. Washington | Bottenfield |
| Garden Hills | Carrie Busey |
| Dr. Howard | Kenwood |
| | Robeson |
| | South Side |
| | Westview |

Alves 2nd Report 7, Bates No. 345.

Dr. Alves determined the following with respect to seat capacity:

| Geographic Location | No. of Strands [3] | Capacity of Students | K–5 Resident Student Population | Resident Utilization Rate |
|---|---|---|---|---|
| North | 12 | 1,656 | 1,745 | 105.4% |
| South | 21 | 2,898 | 2,448 | 84.5% |

Alves 2nd Report 7, Bates No. 345.[4]

Thus, according to Dr. Alves, there continues to be a shortage of seats on the north side. See chart below.

### 2001–02 STRUCTURAL DISPLACEMENT

| | Student Population | Capacity | Strands | Utilization Rate | Shortfall/ Excess Capacity |
|---|---|---|---|---|---|
| South Side | 2,448 | 2,898 | 21 | 84.5% | + 450 |
| North Side | 1,745 | 1,656 | 12 | 105.4% | − 89 |

Alves 2nd Report 7, Bates No. 345.

The level of structural displacement in the District varies depending on what utilization rate is adopted.

| Utilization Rate | Seats Needed |
|---|---|
| 100 % | 89 |
| 92.1% (Current District Rate) | 227 |
| 84.5% (South Side Rate) | 346 |

Alves 2nd Report 7, Bates No.345

According to Dr. Alves, the north side still has the capacity shortage equivalent to at least two enrollment strands or approximately 276 seats. Alves 2nd Report 7, Bates No. 345.

After review of these issues, Dr. Alves strongly recommended that the District consider the feasibility of adding at least two enrollment strands in the north side by expanding Booker T. Washington School facility. Currently, Booker T. Washington is only a two-strand school with a maximum capacity of only 276. Moreover, it is the only two-strand school in the North Side and it is located within

Support Services, dated May 15, 1997. SD Memo 1, Bates No. 257.

2. The District constructed Stratton Elementary to replace Columbia Elementary and serve the community in the same geographical area.

3. A strand refers to the number of classes in a building. For the purposes of Champaign's elementary schools, one strand encompasses one class per grade level from K

4. This maximum capacity figure is based on utilizing Stratton as a four-strand school.

one of the most densely populated areas of the District. Alves 2nd Report 8, Bates No. 346.

### 3. *Seat Capacity Based on April 2001 Kindergarten Controlled Choice Lottery*

Preliminarily, based on information from the April 12, 2001 Kindergarten ("K") Controlled Choice Lottery, the following chart shows: (1) the number of kindergarten seats; (2) the number of students who applied for early K assignments and who resided within the 1.5 mile "proximity A" [5] area of each school; and (3) each school's resident kindergarten utilization rate and average kindergarten class size if all proximity A applicants had been assigned to that school.

| School | Kindergarten Seats | Early Applicants Who Resided in Proximity A | Resident K Utilization Rate |
|--------|--------------------|--------------------------------------------|-----------------------------|
| Stratton | 69 | 124 | 180% |
| Washington | 46 | 66 | 143% |
| Garden Hills | 69 | 63 | 91% |
| Barkstall | 69 | 31 | 45% |

Alves 1st Report 2–3, Bates Nos. 334–35.

The racial composition of the proximity A students in each school was:

| School | African–Americans | Non–African–Americans |
|--------|-------------------|------------------------|
| Stratton | 59.7% | 40.3% |
| Washington | 72.7% | 27.3% |
| Garden Hills | 54 % | 46 % |
| Barkstall | 6.5% | 93.5% |

Alves 1st Report 2–4, Bates Nos. 334–336.

Only 21% of the proximity A students selected Stratton as their first-choice school. All were assigned to Stratton, including 21 African–Americans. Only 2 (or 6%) of the 34 white students in Stratton's proximity A selected Stratton as their first choice. Alves 1st Report 2, Bates No. 334.

Only 17% of the proximity A students selected Washington as their first-choice school. All were assigned to that school. None of the white students who resided in walking distance selected Washington as their first-choice school. This data suggests that Washington is not an especially attractive school for students who reside within walking distance of it. Alves 1st Report 2–3, Bates Nos. 334–35.

Only 35% of the proximity A students selected Garden Hills as their first-choice school. All were assigned to that school, including 13 African–Americans and 10 non-African-Americans. Alves 1st Report 3, Bates No. 335.

97% of the proximity A students selected Barkstall as their first choice school. All were assigned to that school. Alves 1st Report 3, Bates No. 335.

Dr. Alves' conclusions from School Level Structural Displacement Analysis:

**5.** The proximity A area is the area that encompasses a radius of 1.5 miles around the elementary school.

(1) Data suggests that Stratton and Washington do not have sufficient enrollment capacities to accommodate all elementary students who reside within their 1.5 mile proximity A areas, located within the predominately African–American section of the city. Alves 1st Report 4, Bates No. 336.

(2) Data also shows that neither Stratton nor Washington is attracting most of the students who reside within walking distance, and Garden Hills is having difficulty attracting resident students. Alves 1st Report 4, Bates No. 336.

(3) These schools, in the African–American community, north of University Avenue, are in sharp contrast to Barkstall, which has more than enough seats for its proximity A students and which is extremely attractive to parents who reside within walking distance. Alves 1st Report 4, Bates No. 336.

(4) Data clearly shows that African–American students have not been denied access to their proximity A school because of racial fairness guidelines. As a result of Controlled Choice and racial fairness guidelines, it appears that African–American and students from all other racial groups are attending schools of choice that they could otherwise not attend. Alves 1st Report 4, Bates No. 336.

(5) These findings strongly suggest that any facility use recommendations that may be necessary to alleviate the physical or structural displacement of students in the District's more densely populated areas must also include recommendations for making schools like Stratton, Washington, and Garden Hills more attractive to the parents and students from diverse backgrounds who reside near these schools. Alves 1st Report 4, Bates No. 336.

**B.  Controlled Choice Kindergarten Enrollment in 2001–02**

Early Kindergarten application for the 2001–02 school year took place during the month of March, 2001, and kindergarten assignments were made on April 12, 2001. Alves 1st Report, Memo intro, Bates No. 337.

A total of 514 students applied for early Kindergarten assignment for the 2001–02 school year. The ethnic breakdown of these 514 students includes 142 African–American (27.6%), 287 white (55.8%), 19 Hispanic (3.7%), 39 Asian (7.6%), 1 Native American (0.2%) and 26 other ethnic groups (5.1%). Alves 1st Report, Memo ¶ 1, Bates No. 337.

Application data was processed at the Family Information Center, using Controlled Choice Lottery software, and staff conducted multiple data accuracy and integrity tests on each student's application. To the best of Dr. Alves' knowledge, all assignments were processed in accordance with the District's Controlled Choice policies and procedures and enrollment fairness guidelines. Alves 1st Report, Memo ¶¶ 2, 3, 9, Bates Nos. 337–38.

The Controlled Choice Lottery for the 514 Kindergarten applicants was conducted at the Family Information Center on April 12, 2001. 460 applicants (89.5%) were assigned to their firstchoice school; 33 (6.4%) were assigned to their second-choice school; 17 (3.3%) were assigned to their [third] choice school; and 4 (0.8%) did not receive an assignment to a school of choice. Overall, 99.2% of the Kindergarten applicants were assigned to a school of choice. Alves 1st Report, Memo ¶ 4, Bates No. 337.

The 54 students who did not receive their first-choice school, including the 4 unassigned students, were placed on a wait list for their first choice school. Alves 1st Report, Memo ¶ 5, Bates No. 338.

All 142 African–American applicants (100%) were assigned to their first choice school, and 318 non-African-American applicants (85.5%) were assigned to their first choice school. Alves 1st Report, Memo ¶ 6, Bates No. 338.

All 197 applicants (100%) that had a sibling priority were assigned to their first choice school. Alves 1st Report, Memo ¶ 7, Bates No. 338.

266 of the 267 proximity A students (99.6%) who reside within 1.5 miles of their first choice school were assigned to their first choice school. 20 of the proximity B [6] (60.6%) who do not reside within 1.5 miles of any Champaign elementary school were assigned to their first-choice school. Alves 1st Report, Memo ¶ 8, Bates No. 338.

All late kindergarten applicants for the 2001–02 school year will be assigned by the Controlled Choice Walk–In software at the Family Information Center. Alves 1st Report, Memo ¶ 10, Bates No. 338.

## C. *Trends Comparing 1996–97 to 2001–02 Student Assignment Data*

The racial composition of students residing in the north and south side has changed very little since the 1996–97 school year with 74.5% of the District's African–American students still residing in the north side and 25.4% residing in the south side, a net change of 2.6%. Alves 2nd Report 8–9, Bates Nos. 346–7.

The District has made progress in reducing its elementary school utilization rate since the 1996–97 school year. Alves 2nd Report 8–9, Bates Nos. 346–7.

The construction of Barkstall Elementary School significantly affected the utilization rate in the south side by 9%. The opening of Stratton Elementary School has reduced the utilization rate in the north side by 8.9%. Overall, the construction of Barkstall and Stratton has added more elementary strands to the District and resulted in a net decrease of 9.3% in the district-wide utilization rate. Alves 2nd Report 8, Bates No. 346.

## D. *1999 Controlled Choice Survey Indicates Positive Effects of Controlled Choice*

In the summer of 1999, the District retained the Metro Chicago Information Center to conduct a survey of how parents choose schools for their children, their satisfaction with the first year of the Controlled Choice Plan, desired program enhancements, and other aspects of the plan. The survey included interviews with 387 parents, including 221 white parents and 131 African–American parents. CCS 2, Bates Nos. 589–590.

The Metro Chicago Information Center is an independent, nonprofit research organization founded in 1990 with the support of the John D. and Catherine T. MacArthur Foundation, the McCormick Tribune Foundation, the Chicago Community Trust, and the United Way/Crusade of Mercy of Chicago. CCS 3, Bates No. 591.

According to the survey, the most important reasons parents chose the schools that they did include: friendliness, openness, responsiveness of school staff; safety; school program (year round, magnet theme, arts/drama, language); quality of teachers; discipline, uniforms; quality of principal as educational leader or as disciplinarian; older sibling needs; experience of other family members, friends; and closeness to home, location. CCS 4, Bates No. 592.

---

**6.** The proximity B area encompasses the area    outside the proximity A radius.

Among white parents whose children attended schools other than Stratton, only 6% said they considered choosing Stratton. Increasing the diversity of enrollment at Stratton will require a full-scale strategy of program enhancement, transportation, the perception of increased discipline, and the perception of increased security. CCS 19, Bates No. 607.

By an extraordinarily high margin, parents were satisfied with their child's kindergarten experience during the first year of Controlled Choice. CCS 21, Bates No. 609.

Parents had a high level of satisfaction with the schools choices that were available. 38% of African–Americans surveyed ranked their school choices as "excellent." CCS 23, Bates No. 611. Seventy-seven percent (77%) of all parents believed the Controlled Choice Plan was administered fairly. CCS 29, Bates No. 617.

Although there were small areas of significant concern and racial tension, parents gave predominantly positive ratings to the climate of race relations in the schools. CCS 33, Bates No. 621.

## EDUCATIONAL EQUITY

### A. Climate and Discipline

#### 1. Pre–Agreement Data

In 1996–97, discipline rates were higher for African–Americans than whites and other student groups. EEA 16, Bates No. 83.

District discipline policy called for pre-intervention processes prior to student disciplinary actions. While these processes appeared to be documented in individual student folders, no centralized effort was apparent to record, document, and analyze these pre-intervention steps. EEA 16, Bates No. 83.

In 1996–97, 303 students were given an out-of-school suspension. Of that number, African–Americans were overrepresented to a statistically significant degree at all levels. OCR 18, Bates No. 42.

At the elementary school level for the 1996–97 school year, African–American students represented almost 81% of the students given an out-of-school suspension. OCR 19, Bates No. 43.

At the middle school level for the 1996–97 school year, African–Americans represented almost 68 % of the students who were given an out-of-school suspension. OCR 19, Bates No. 43.

More than 12% of middle school African–Americans were given an out-of-school suspension. Less than 3% of white middle school students were given out-of-school suspension. OCR 19, Bates No. 43.

At the high-school level for the 1996–97 school year, African–Americans represented approximately 64% of the students who were given out-of-school suspensions. OCR 19, Bates No. 43.

More than 13% of high school African–Americans were given out-of-school suspensions. Less than 3% of white high-school students are given out-of-school suspensions. OCR 19, Bates No. 43.

During the 1997–98 school year, 63% of all suspensions were given to African–Americans, who comprised 32% of the student population. EEA 49, Bates No. 116.

#### 2. District's Actions Post–Agreement

##### a. The 2000 Climate Survey

In 2000, the District retained Dr. Mark Aber at the University of Illinois at Champaign to conduct a Climate Study in accordance with the OCR Resolution Agreement. OCR 4–5, Bates Nos.28–29; Climate Study, Bates Nos. 379–545.

The results of the study revealed a curious pattern of findings related to how Unit 4 staff and parents think about race and culture. Climate Study 29, Bates No. 407.

Despite wide support for the notion of color-blind policies and practices, study results indicated that the majority of Unit 4 teachers believe that they and their colleagues demonstrate cultural understanding when teaching children of different backgrounds. These results exposed a limited perspective on cultural understanding and sensitivity on the part of some staff. Climate Study 29, Bates No. 407.

Because they did not see racial disparities and discipline in academic programs as unfair, most staff and parents did not see a significant need for the District to change its policies to better address issues of race. Climate Study 28, Bates No. 406.

Many whites believed that parents, economics, and/or society are to blame for the educational disparities between African–Americans and whites. Climate Study 32–34, Bates Nos. 410–12.

Consistent with their view of fairness, need for change and explanations for racial disparities, results indicated most white staff and parents did not view as very important the hiring of teachers and administrators to reflect the number of African–American students in Unit 4 schools. Climate Study 34–35, Bates Nos. 412–13.

The Survey indicated that many in the District are even afraid to talk about race issues. Climate Study 27, Bates No. 405.

There almost seemed to be a belief that the best way to deal with issues of race is to ignore the fact that people are of different races. Climate Study 27, Bates No. 405.

To the extent that this "color-blind" perspective led people to acknowledge African–American experiences and perceptions, many people, particularly African–American, saw this perspective as inherently demeaning and unfair. Climate Study 28, Bates No. 406.

The Survey reviewed the educational research on the effect of climate on student learning, including that:

(1) Perceived school climate is important to the health and well-being of school children. Climate Study 6, Bates No. 384.

(2) Negative school climate perceptions are associated with poor achievement, emotional problems, behavior difficulties, dropping out, absenteeism and school dissatisfaction. Climate Study 6, Bates No. 384.

(3) Ignoring racial differences and perceptions of climate will further marginalize those with the most negative experiences and perceptions. Thus, corrective steps must be taken to address this. Climate Study 35, Bates No. 413.

(4) Minority students' capacity to learn in school is greatly enhanced when teachers have a deep appreciation of their students' racial, cultural, religious, and family backgrounds and experiences. Learning is inhibited when teachers do not have such understanding. Thus, an unintentional consequence of this "color blind" perspective is the interference with this understanding and damage to the students' ability to learn. Climate Study 29, Bates No. 407.

(5) When an African–American student in Unit 4 observed a gross over-representation of African–American students in detention and special education, and a gross underrepresentation of African–American students in gifted and talented programs, he or she is very likely to interpret those numbers as having negative implications for himself or herself. Climate Study 35–36, Bates Nos. 413–14.

Dr. Aber recommended several actions. Climate Study 5, 36–37, Bates Nos. 383, 414–415.

(1) Increase cultural competence of teaching staff.

(2) Create school forums to discuss the climate study results and make recommendations to address issues raised by them.

(3) Hire more African–American regular classroom teachers.

(4) When hiring non-African-American teachers, develop selection criteria that value cultural competence.

(5) Develop incentives to reward teachers who teach students of diverse backgrounds well.

(6) Develop incentives for teachers to learn from colleagues who demonstrate success teaching students of diverse backgrounds well. These incentives should encourage inter-racial collaboration which will enable people to get to know one another by working closely together.

(7) Reduce and eventually eliminate all "ability based" tracking.

(8) Establish goals and strategies to reduce the overall number of disciplinary and special education referrals.

(9) Implement in-school educational programs for students focused on issues of races, culture and ethnicity.

Ultimately, to successfully address negative climate perceptions will require reduction or elimination of existing racial disparities. Climate Study 35, Bates No. 413.

In March 2001, in response to the Climate Study, the District proposed the following actions be taken:

(1) Hold community forums to continue discussing race-related issues;

(2) Conduct discussions with the district-wide Diversity Committee to address staff perceptions;

(3) Examine the curriculum to assure a strong multi-cultural component in all subjects;

(4) Continue training all staff on diversity issues and on how to achieve success with all students in a multi-cultural community; and

(5) Continue to emphasize Affirmative Action and Equal Employment Opportunity policies. CS Follow–Up 1, Bates No. 546.

In summer 2000, the District updated the Education Equity Audit and concluded that:

(1) In 1999–2000, African–Americans comprised 65% of all discipline referrals. EEAR Disc. 8, Bates No. 218.

(2) In 1999–2000, African–Americans comprised the following percentages of disciplinary suspensions and expulsions in elementary schools: 90.2% for insubordination; 84.6% for verbal abuse and threats; 82.4% for physical acts and disruption; 66.7% for substances; and 73.7% for other. EEAR Disc. 15, Bates No. 225.

(3) In 1999–2000, African–Americans comprised the following percentages of disciplinary suspensions and expulsions in middle schools: 96.7% for insubordination; 85.5% for verbal abuse and threats; 80.5% for physical acts and disruption; 90.0% for substances; and 85.0% for other. EEAR Disc. 15, Bates No. 225.

(4) In 1999–2000, African–Americans comprised the following percentages of disciplinary suspensions and expulsions in high schools: 74.6% for insubordination; 59.1% for verbal abuse and threats; 72.2% for physical acts and disruption; 61.2% for substances; and 76.5% for other. EEAR Disc. 15, Bates No. 225.

(5) The District has eliminated subjective categories for suspension in the Student Code of Conduct. EEAR Disc. 4, Bates No. 214.

(6) The Positive Behavior Intervention Strategies (PBIS) process has been implemented in all schools and focuses on positive and progressive alternatives, prior to using negative or punishment strategies.[7] EEAR Disc. 4–5, Bates Nos. 214–15.

(7) The District expanded peer mediation programs in all elementary and high schools. EEAR Disc. 4, Bates No. 214.

(8) The District has implemented the "2nd Step Violence Prevention Program" in all elementary schools. EEAR Disc. 5, Bates No. 215.

(9) The District has implemented mentor programs in all buildings. EEAR Disc.2001–5, Bates No. 676.[8]

(10) At the elementary and middle school levels, the District has adopted an In-school Alternative to Suspension program.[9] EEAR Disc. 2001–6, Bates No. 677.

## B. Special Education

### 1. Pre–Agreement Data

#### a. Special Education, generally

African–Americans were over-represented in special education programs. This serves to preclude access to regular education and advanced opportunities. Of particular note are a disproportionate number of African–American students in programs where human judgment may play a greater role than in programs with "hard" diagnostic criteria. EEA 16, Bates No. 83.

Between 1993–96, African–American students comprised 32% of the student population and 44 % of the special education population. EEA 40, Bates No. 107.

Between 1993 and 1996, 26% of African–Americans had special education needs as compared to 17% of white students and 8% of other racial group students. EEA 40, Bates No. 107.

#### b. Speech and Language

During the 1995–96 school year, the District had 880 students placed in special speech and language services excluding those students receiving speech and language services. African–American students represented 419, or 47.7%, of these students. OCR determined that African–American students were over-represented in the special education per room to a statistically significant degree. OCR 26, Bates No. 50.

#### c. Learning Disability

African–Americans were over-represented to a statistically significant degree in the category of Specific Learning Disability ("SLD") –218 out of 518 or 42.1% during the 1995–96 school year. OCR 26, Bates No. 50.

Between 1993–96, African–Americans comprised 40% of SLD students and 32 % of the entire student population. EEA 42, Bates No. 109.

Between 1993 and 1996, 6% of all students were designated as having an SLD;

---

7. Plaintiffs have noted that PBIS is not a discipline initiative that addresses equity issues.

8. Neither Plaintiffs nor PIC has had the opportunity to review for accuracy the 2001 District Reports on Discipline, Special Education and Achievement. Based on that review, the information may change slightly.

9. Plaintiffs have noted several concerns regarding this program and its impact on African–American students.

8% of African–Americans were designated as SLD. EEA 42, Bates No. 109.

#### d. *Behavior Disorder*

In the 1995–96 school year, African–Americans were overrepresented to a statistically significant degree in the category of Behavior Disorder ("BD")–91 of 133, or 68.5%. OCR 27, Bates No. 51.

During the 1995–96 school year, African–Americans constituted 68.5% of students with a primary disability of BD. OCR 28, Bates No. 52.

Between 1993 and 1996, African–Americans comprised 61% of BD students; during this time they comprised 32% of the student population. EEA 44, Bates No. 111.

Between 1993 and 1996, 2% of all students district-wide were designated as BD; a total of 4% of the entire African–American student population was so designated. EEA 44, Bates No. 111.

#### e. *Mental Impairment*

In the 1995–96 school year, African–Americans were overrepresented to a statistically significant degree in the category of Mental Impairment ("MI")—87 of 152, or 57.3%. OCR 27, Bates No. 51.

Between 1993 and 1996, African–Americans comprised 52 % of MI students; during the same period African–Americans comprised 32 % of the student population. EEA 43, Bates No. 110.

Between 1993 and 1996, 1% of all students were designated as MI; 3% of African–Americans were designated as MI. EEA 43, Bates No. 110.

#### f. *Referral Process*

In the 1995–96 school year, African–Americans were overrepresented to a statistically significant degree in the group of students referred for initial case study evaluations for special education. OCR 27, Bates No. 51.

At each elementary school in the District, the rate of referral of African–American students for case study evaluations for special education exceeded the rate of referral for white students. OCR 27, Bates No. 51.

Disparities in the effectiveness of individual Building Support Teams ("BSTs") were evidenced by the records maintained by the teams when documenting actions taken regarding specific students at rates of referral by race. OCR 27, Bates No. 51.

During the 1995–96 school year, African–Americans were overrepresented to a statistically significant degree in the group of students referred by BSTs for discussion and for initial case study evaluation. OCR 27, Bates No. 51.

#### 2. *District's Actions Post–Agreement*

In 1999–2000, African–American students comprised 48.6% of special education students in elementary schools, 56% in middle schools, and 43% in high schools. EEAR SpEd 2, Bates No. 197.

Screening occurs for all students in accordance with Illinois law. EEAR SpEd 3, Bates No. 198.

Elementary teachers identify students with underachievement, poor behavior and excessive absenteeism. These students are monitored and provided early interventions. EEAR SpEd 3, Bates No. 198.

The District has reviewed and continues to monitor the racial, ethnic, and gender balance of BSTs. EEAR SpEd 3, Bates No. 198.

On August 15, 1997, the District discontinued "informal" psychological evaluation of students prior to conducting case study evaluations. EEAR SpEd 3, Bates No. 198.

The District provided training for staff who serve on BSTs, including identification procedures, intervention strategies, and evaluation procedures. EEAR SpEd 3, Bates No. 198.

In 1999–2000, training was conducted on "Instructional Strategies for Hard to Reach Students." EEAR SpEd 3, Bates No. 198.

In 1998–99, the District retained a special education consultant who visited all BSTs. A "self assessment" survey was completed and a training matrix was developed. EEAR SpEd 3, Bates No. 198.

On March 14–15, 2001, the District retained Dr. James Patton to review data to support eligibility and placement decisions, and other patterns that could serve as recommendations to staff to better serve this population of students. Patton 1, Bates No. 548.

Patton's report indicated that, while psychological portions of student files provided more than adequate documentation and evidence of disability in some areas, cultural and social data were lacking, and the total environment of the child may not have been considered. Patton 1, Bates No. 548.

Patton recommended collecting more substantive data in the SDS category regarding culture and cultural traditions and influences on the child, home and school. Patton 1, Bates No. 548.

In 1999–2000, African–American students comprised 50.2% of the Speech and Language enrollment in the elementary schools. EEAR SpEd 2, Bates No. 197.

In 1999–2000, African–Americans comprised 42.8% of the elementary SLD enrollment. EEAR SpEd 2, Bates No. 197.

In 1999–2000, African–Americans comprised 59.1% of the BD enrollment district wide. EEAR SpEd 2, Bates No. 197.

In 1999–2000, African–Americans comprised 61.7% of MI enrollment district wide. EEAR SpEd 2, Bates No. 197.

To ensure equitable identification, BD criteria was tightened in 1998 and LD criteria was tightened in 1999–2000. EEAR SpEd 3, Bates No. 198.

### C. Enrollment and Attendance

#### 1. Pre–Agreement Data

While African–American enrollment levels appeared to show increasing or flat enrollment at elementary and middle school levels, African–American enrollment declined dramatically, from 29% in 1992–1993 to 23% in 1997–98, at the high school level. EEA 22, Bates No. 89.

African–American student attendance rates lag behind that of their white counterparts. EEA 16, Bates No. 83.

For the 1996–97 school year, at the elementary level, the mean number of days attended for African–Americans was 171 days compared to 174 for other racial and ethnic groups. Notably, 10% of African–Americans missed 36 days or more of school. EEA 24, Bates No. 91.

For the 1996–97 school year, at the middle school level, the mean number of days attended for African–Americans was 168, compared to 172–73 days for other racial and ethnic groups. EEA 25, Bates No. 92.

For the 1996–97 school year, at the high school level, the mean number of days attended for African–Americans was 159, compared to 165–67 days for other racial and ethnic groups. EEA 26, Bates No. 93.

For the 1996–97 school year, days attended appears to drop off dramatically at the lowest 25th percentile. EEA 26, Bates No. 93.

The disparity between African–American and white and other students in attendance rates, dropout rates, and disci-

pline rates contribute to lower graduation rates for African–American students compared to their percentage of the school population. EEA 16, Bates No. 83.

### 2. District's Actions Post–Agreement

While Dr. Peterkin and Mr. Lucey have made several recommendations to address this issue, there is nothing in the record to indicate what steps the District has taken in this regard.

## D. Mobility/Drop Out Rates

### 1. Pre–Agreement Data

African–American dropout rates were higher than those of white and other student groups. EEA 16, Bates No. 83.

In 1997, 59% of high school dropouts were African–American. This compares to an overall African–American high school enrollment of 26%. This disproportionate percentage stayed roughly consistent between 1993 and 1997. EEA 70, Bates No. 137.

African–American student high school graduation rates decreased from 94% in 1993 to 70% in 1997. High school graduation rates for white students was 90% in 1997. EEA 71, Bates No. 138.

The disparities between African–American and white and other students in attendance rates, dropout rates, and discipline rates contribute to lower graduation rates for African–American students as compared to their percentage of the school population. EEA 16, Bates No. 83.

### 2. District's Actions Post–Agreement

The District has increased the number of African–Americans graduating from high school during the period from 1998–2000. EEAR Achvt. 2, Bates No. 232.

The District has decreased significantly the number of African–Americans dropping out of high school from school year 1997. EEAR Achvt. 2, Bates No. 232.

## E. Gifted Education

### 1. Pre–Agreement Data

Prior to the 1997–98 school year, at the elementary level, only pre-selected students were given gifted and talented program screening tests. If the student did not have a strong teacher or parent advocate, the student was not given access to the prerequisite screening test and, therefore, did not have access to the program. EEA 15, Bates No. 82.

In the spring and summer of 1996, only 6.3% of African–Americans took the Cognitive Abilities Test, a voluntary test used to place students in gifted programs. The overall enrollment of African–Americans in grades one through four was approximately 34%. OCR 6–7, Bates Nos. 30–31.

In the 1996–97 school year, overall African–American enrollment in grades two through five was approximately 33%; African–American enrollment in the gifted and talented program in elementary school was 2.7%. OCR 7, Bates No. 31.

In 1997–98, the African–American population in Champaign was 38%; African–American enrollment in the elementary school gifted and talented program was 3%. EEA 31, Bates No. 98.

For students of a higher socio-economic status during the 1997–1998 school year, 16.85% of students were screened for gifted and talented programs. Whites were screened at 16.79%; Asians, Hispanics, and Native Americans were screened at 31.29%; African–Americans were screened at 5.88%. EEA 32, Bates No. 99.

For students of a lower socio-economic status during the 1997–98 school year, 4.14% of students were screened for gifted and talented programs. Whites were screened at 6.81% Asians, Hispanics, and Native Americans were screened at 13.25% and African–Americans were screened at 2.19%. EEA 32, Bates No. 99.

African–American students are also under-represented in the gifted and talented Programs at the middle school level:

At the middle school level, during the 1996–1997 school year, a total of 376 District students enrolled in a least one segment of the gifted program. Of this total, 23 or 6.2% of the students are African–American. When this ratio was compared to the African–American middle school students enrollment rate of approximately 32%, the difference is statistically significant. OCR 7, Bates No. 31.

African–Americans were under-represented to a statistically significant degree among sixth grade students recommended for placement during the 1997–98 school year in upper level mathematics courses and among eighth grade students recommended for placement during the 1997–98 school year in upper level high school mathematics, science, and English courses. OCR 11, Bates No. 35.

African–Americans were enrolled in the middle school gifted and talented program as follows:

|  | 1995–96 | 1996–97 | 1997–98 |
|---|---|---|---|
| Math/science | 3% | 1% | 4% |
| Language arts/ social studies | 2% | 2% | 3% |
| Performing arts | 12% | 16% | 15% |

During these years, African–Americans comprised 31–32% of the middle school population. EEA 34, Bates No. 101.

### 2. District's Actions Post–Agreement

The District has changed the screening process so all first graders are screened with a non-verbal assessment validated as a tool for increasing the participation of minority students in the gifted and talented programs. EEAR Gifted 3, Bates No. 186.

The District has engaged in extensive community and parental outreach, including: (1) sending flyers home to all families; (2) visiting the homes of families who decided not to have their child participate in the gifted program; (3) telephoning families regarding placement and screening; and (4) having the Gifted Director appear on an African–American radio program to explain, answer questions and encourage parents to have their children participate in the gifted program. EEAR Gifted 2, Bates No. 185.

At the elementary school level, the District has expanded enrichment programs (non-self-contained) to Carrie Busey, Kenwood and Robeson Elementary Schools. EEAR Gifted 2, Bates No. 185.

At these schools in 1999–2000, 24% (88 out of 367) of the total number of participating students were African–American. EEAR Gifted 2, Bates No. 185.

At the middle school level, the District has increased the number of African–American students participating in the academic segments. EEAR Gifted 2, Bates No. 185.

At these schools in 1999–2000, the African–American participation in the academic segments was: (1) 12% in Language Arts/Social Studies; (2) 9% in Math/Science; and (3) 15% in Performing Arts. EEAR Gifted 2, Bates No. 185.

### F. High School Upper Level Classes

#### 1. Pre–Agreement Data

At the high school level during the 1996–97 school year, African–Americans were under-represented to a statistically significant degree in upper level (Level III) courses in every subject area in which such courses were offered. OCR 11, Bates No. 35; EEA 16, Bates No. 83.

In the 1997 school year, 9% of students enrolled in Level III courses were African–American as compared to the 26% African–American overall school enrollment. In comparison, 84% of white students had at least one Level III class during that

year. The percentage of African–American students taking a least one Level III course declined slightly between 1993 and 1997. EEA 64, Bates No. 131.

In the 1997 school year, African–American students represented 5% of the total Advanced Placement ("AP") course enrollment in high school. This compares to overall African–American student enrollment of 26%. EEA 67, Bates No. 134.

African–American students took fewer AP tests and scored lower on AP examinations. EEA 17, Bates No. 84.

From 1995–97, African–Americans wrote only 1% of all AP examinations. The 1997 ratio for African–Americans taking AP courses to those taking AP exams was 0.4 to 1; the similar ratio for whites was 0.73 to 1 and for Hispanic, Asian, and other students was 0.8 to 1. EEA 69, Bates No. 136.

In the 1997 school year, African–Americans represented 5% of the AP enrollment in high school. This compares to overall African–American student enrollment of 26%. EEA 67. Bates No. 134.

Between 1993 and 1997, African–American AP course grades were not as good as their white, Asian, Hispanic, or other classmates. About 50 % of the grades given to African–American students were "A's" or "B's;" this compares to 70% of white students' grades and 72 % of Asian, Hispanic, and other student grades. EEA 68. Bates No. 135.

### 2. *District's Actions Post–Agreement*

African–American student participation in Level III courses has increased slightly from 1997–98 to 1999–2000. EEAR Achvt. 2, Bates No. 232.

In 1997–98, African–American enrollment in AP courses dropped to 3%. EEAR Achvt. 2, Bates No. 232.

### G. *High School Lower Level Courses*

### 1. *Pre–Agreement Data*

African–American students were over-represented in less rigorous Level I and Level II high school courses. EEA 16, Bates No. 83.

During the 1996–97 school year, African–American students were over-represented to a statistically significant degree in the District's lower grouped high school mathematics, science, and English courses. OCR 11, Bates No. 35.

In the 1997–98 school year, 47% of students enrolled in Level I and II courses were African–American. During the same time the overall African–American enrollment was 26%. EEA 63, Bates No. 130.

African–Americans were over-represented to a statistically significant degree among eighth grade students recommended for placement during the 1997–98 school year in lower group high school mathematics, science, and English courses. OCR 11–12, Bates Nos. 35–36.

### 2. *District's Actions Post–Agreement*

All Level I high school courses will be eliminated by the Fall of 2002. EEAR Achvt.2001 5, Bates No. 704.

### H. *Student Achievement*

### 1. *Pre–Agreement Data*

Some schools did not have sufficient remedial reading programs in place to meet the needs of students reading below grade level. OCR 27, Bates No. 51.

Departments and schools have operated largely independently of one another, without sufficient management information, thus, very likely diluting the overall impact of any attempted intervention or program resources. EEA 17, Bates No. 84.

African–Americans scored lower than their white and other student counterparts on standardized achievement tests and, on average, performed below national norms. EEA 17, 54, Bates No. 84, 121.

In the 1996–1997 school year, on the Stanford 9 Basic/Partial Battery standardized test administered to grades 3–7, African–American students had generally lower percentile scores than white and other racial groups. EEA 55, Bates No. 122.

In the 1996–1997 school year, on the Stanford 9 Basic/Partial Battery standardized test administered to grades 3–7, African–American students of lower socio-economic status did significantly worse than whites and other racial groups of lower socio-economic status. EEA 59, Bates No. 126.

In the 1996–1997 school year, on the Explore standardized test administered to grade 8, African–American students generally had lower percentile scores than whites and other racial groups, even when factoring for socio-economic status. EEA 61, Bates No. 128.

In the 1996–1997 school year, on the Plan Composite standardized tests administered to grade 10, African–American students generally had lower percentile scores than whites and other racial groups, even factoring in socio-economic status. EEA 62, Bates No. 129.

In the 1996–1997 school year, African–Americans earned 4% of the "A"s in Level III courses compared to 90% for white students and 7% for other racial group students. EEA 65, Bates No. 132.

In the 1996–1997 school year, African–Americans earned 5% of the "B"s in Level III courses compared to 88% for white students and 7% for other racial group students. EEA 66. Bates No. 133.

## 2. *District's Action Post–Agreement*

In August 2000, a balanced literacy curriculum was adopted based on national literacy standards; it offers a consistent framework for reading instruction. EEAR Achvt.2001 5, Bates No. 704.

Academic enrichment specialists are working at 9 of 11 elementary buildings. EEAR Achvt.2001 5, Bates No. 704.

Extended day programs are offered at all elementary and middle schools. EEAR Achvt.2001 5, Bates No. 704.

Over 412 America Reads/America Counts tutors are assigned to pre-K through 8th grade. EEAR Achvt.2001 5, Bates No. 704.

Both high schools are developing extended learning programs. EEAR Achvt. 2001 5, Bates No. 704.

Many professional activities have been conducted in the areas of student achievement, school climate, diversity, and Best Practice training. EEAR Achvt.2001 6, Bates No. 705.

High schools have student support activities for students who may have difficulty meeting standards, including Together Everyone Achieves More, Peer Tutoring, Jump Start Summer Program, Spanish Tutoring, Before/During/After School Tutoring, Upward Bound, and CHANCE. EEAR Achvt. 3, Bates No. 233.

## I. *CARE Alternative School Program*

### 1. *Pre–Agreement Data*

Students were referred to CARE middle or high school by administrators at their home schools because of attendance, behavior, or academic problems, or because of expulsion. OCR 16, Bates No. 40.

Students could refer themselves to CARE. OCR 16, Bates No. 40.

During the 1996–97 school year, almost 70% of the students assigned to the CARE middle school were African–American. OCR 16, Bates No. 40.

Almost 60% of the students assigned to the CARE high school were African–American according to data maintained by the District for the 1996–97 school year. OCR 16, Bates No. 40.

Students do not typically return to their home schools once admitted to the CARE program. OCR 16, Bates No. 40.

### 2. District's Actions Post–Agreement

While Dr. Peterkin and Mr. Lucey have made several recommendations addressing this issue, there is nothing in the record to show what steps the District has taken in this regard.

### J. Columbia (Stratton) Elementary School

The Columbia Elementary School was 92 years old when it was replaced in 1998 with the newly constructed Stratton Elementary School.[10]

Columbia, and now Stratton, have a history of being racially identifiable in that its student composition is largely African–American.

Between 1993 and 1998, African–Americans represented on average 36% of the total Champaign elementary school population. During the period between 1993 and 1998, African–Americans represented on average 78 % of the Columbia Elementary School population. Columbia Report 30, Bates No. 580.

Between 1993 and 1998, the African–American student enrollment percentage at Columbia Elementary School was between 12% and 21% higher than the stipulated maximum African–American student enrollment. Columbia Report 2, Bates No. 552.

Columbia was identified, but not placed on, the Illinois Board of Education Watch List for low academic achievement in 1997.

Given its large enrollment of African–Americans, the disparities that exist in the District are magnified at Columbia/Stratton.

From 1993–97 African–Americans comprised 44% of the District special education placements. For the same period at Columbia, African–Americans comprised 72% of the special education placements. Columbia Report 30, Bates No. 580.

African–American students attending Columbia Elementary School are disproportionately represented among the lowest 10% in elementary school student attendance rates for the 1997 school year. Columbia Report 7, Bates No. 557.

In the 1995, 1996, and 1997 school years, respectively, only 0%, 1%, and 3% of African–American students at Columbia were screened for gifted classes. Yet, the African–American population at Columbia for this period was between 58% to 78% African–American. Columbia Report 2, 13, Bates Nos. 552, 563.

In the 1996, 1997, and 1998 school years, respectively, African–Americans represented 1%, 3%, and 3% of the Columbia gifted population. Yet, African–Americans represented 70–78% of the Columbia student population for the same period. Columbia Report 2, 15, Bates No. 552, 565.

In the 1993, 1994, 1995, and 1997 school years, an average of 89% of African–Americans at Columbia Elementary School participated in the free lunch program. Columbia Report 4, Bates No. 554.

### K. Staffing, Recruitment, & Hiring

#### 1. Pre–Agreement Data

At the time of the Dr. Peterkin & Mr. Lucey Audit, Unit 4's hiring processes ap-

---

**10.** Columbia now houses the middle and high school CARE programs.

peared to operate without sufficient minority representation in the hiring pools or screening teams and the school-based hiring process did not systematically report or record reasons for rejecting minority candidates recruited by the District. EEA 16, Bates No. 83.

At the time of the Dr. Peterkin & Mr. Lucey Audit, African–Americans comprised approximately 10% of the teaching force but the African–American student population exceeded 30%. EEA 79, Bates No. 146.

At the time of the Peterkin & Lucey Audit, African–American males, white males, and Hispanic females were underrepresented compared to the National Teacher Labor Force. EEA 79, Bates No. 146.

### 2. *District's Actions Post–Agreement*

In June 2000, the District adopted the Implementation Plan to achieve, among other things, a substantial level of racial diversity of certified and classified staff district-wide and at each school level to facilitate educational equity (*e.g.*, changing school climate and closing the achievement gap). IP 15, Bates No. 182; EEM ¶ 5F, Bates No. 18.

In the Implementation Plan, the District agreed to the following flexible goals:

(a) A diversity goal for classified staff that included a minority representation at least equal to the proportion of African–Americans qualified for jobs not requiring certification in the availability pool. IP 15, Bates No. 182.

(b) To hire African–American certified and classified staff in accordance with their availability in the Champaign labor market. IP 15, Bates No. 182.

(c) To establish at least four at-large teaching positions for assignment to vacancies in schools for diversity purposes in consultation with building principals. IP 15, Bates No. 182.

(d) To monitor all hires, transfers and terminations of staff and maintain, through aggressive action, diverse personnel in all schools. IP 15, Bates No. 182.

The District has implemented a mandatory training program, occurring each April–May, covering recruiting, screening, and hiring for all administrators who have any significant authority over hiring staff. The training focuses on the importance of creating and maintaining a diverse population and training should be provided on an annual basis. The Diversity Committee is included in this training. IP 15, Bates No. 182; EEA 79–80, item 1; Bates No. 146–47; OCR 36, Bates No. 60

The District has established a balance between school-based staff selection and the District-wide goal of hiring underrepresented groups. Each spring, after the Affirmative Action/ Equal Employment Opportunity Audit is presented to the Board of Education, the District monitors the hiring patterns and retention rates of individual schools and intervenes with individual schools and departments that demonstrate an inability to recruit and hire teachers, administrators, and staff, who are African–American. Monitoring includes exit interviews or questionnaires (conducted 3 months after departure by a neutral party) to provide feedback. IP 15, Bates No. 182; EEA 80, item 2, Bates No. 147; OCR 35–36, items 51 and 52, Bates No. 59–60.

The District has authorized recruiting teams to give on-the-spot contracts to attractive candidates, with a commitment to placement and all District vacancies, not just hard to fill positions. IP 16, Bates No. 183; EEA 80, item 2, Bates No. 147; OCR 35–36, items 51 and 52, Bates No. 59–60.

Each year, the District reassesses the effectiveness of the affirmative action/equal employment opportunity recommendations adopted in March 1996 and the site-based hiring process. In particular, the focus is on incomplete items such as, apartment rebates, grow your own efforts, and financial assistance for noncertified staff to obtain teaching credentials. In addition, the Future Teacher Sponsors at the secondary schools are building a program to train and send students to college to major in education. IP 16, Bates No. 183; EEA 80, item 3, Bates No. 147; OCR 36, item 53, Bates No. 60.

The District is in the process of establishing grow-your-own programs and making connections with local fund providers, e.g., encouraging Martin Luther King scholarship winners to return to Unit 4. IP 16, Bates No. 183.

Each year, the District revisits, strengthens, and expands its mentor-teacher program to retain newly recruited teachers. The District also created a mentor program for new administrators. IP 16, Bates No. 183; EEA 81, item 3, Bates No. 147; OCR 35, Bates No. 60.

## CONCLUSIONS OF LAW

### LEGAL STANDARD

■ "[E]ntry and continued enforcement of a consent decree regulating the operation of a government body depend upon the existence of a substantial federal claim under federal law." *Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir.1993). In addition, court approval of a consent decree must be predicated upon the court's finding, even if based upon a "bobtailed factual inquiry," of "probable success on the merits." *People Who Care v. Rockford Bd. of Educ.*, 961 F.2d 1335, 1338, *reh'g en banc denied* (7th Cir.1992). In sum, the approval of a consent decree must be predicated upon the Court's conclusion, grounded in the evidence submitted by the parties, that the Plaintiff's enjoy a likelihood of success on the merits of their "substantial federal claim."

The Equal Protection Clause provides that "no state ... shall deny any person within its jurisdiction the equal protection of law." While courts ordinarily defer to governmental classifications unless they lack a rational justification, classifications that burden "discrete and insular minorities" are "inherently suspect" under the Equal Protection Clause and are subject to "strict" judicial scrutiny. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Race is the paradigm "suspect" classification triggering strict scrutiny. *See Palmore v. Sidoti*, 466 U.S. 429, 433–34, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). Though state action that, on its face, involves a racial classification is presumptively invalid (*See Personnel Administrator v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)), facially neutral state actions also violate the Equal Protection Clause when the action is intended to have a racial effect and does so. *See Washington v. Davis*, 426 U.S. 229, 240–41, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

In order to establish a prima facie case of school segregation and educational discrimination, a plaintiff must show: (1) segregation or other racially disparate effects; and (2) discriminatory "intent." *See Keyes v. School Dist. No. 1, Denver, Colorado, et. al.*, 413 U.S. 189, 198, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

■ The existence of segregation need not be numerically absolute so long as the public schools are substantially segregated and "racially identifiable." *United States v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1378 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2nd Cir.1987). In addition to the racial and ethnic composition of the particular

schools, a court must examine "every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities." *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Further, a court should consider the quality of education afforded to both white and minority students. *See Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992). Thus, a plaintiff may prove a school to be racially identifiable by factors that may, but need not, include student assignment. *See Brown v. Board of Education*, 892 F.2d 851, 861 (10th Cir. 1989), *vacated on other grounds*, 503 U.S. 978, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992).

■ The Equal Protection Clause proscribes any other conduct of a state actor that intentionally discriminates against minority students in addition to the segregation of minority students. Accordingly, courts have held that conduct which denies minority students the educational opportunities afforded to white students constitutes unlawful intentional conduct that unfairly burdens minority students. *See e.g. People Who Care*, 961 F.2d at 1335; *U.S. v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd* 837 F.2d 1181 (2nd Cir.1987); *Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1977). Even government conduct that lessens racial imbalance between individual schools in a district may nonetheless violate the Equal Protection Clause. For example, if a school board requires only minority students to bear the burden of busing to achieve integration, the board's actions, while it *reduces* segregation, may still violate Equal Protection. *See NAACP v. Lansing Bd. of Educ.*, 429 F.Supp. 583, 621 (W.D.Mich.1976), *aff'd*, 559 F.2d 1042 (6th Cir.1977), *cert. denied*, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978).

In addition to proving that the defendant's conduct created or maintained racial imbalance in the schools, a plaintiff must show that the conduct was motivated by discriminatory intent. *See Keyes*, 413 U.S. at 208, 93 S.Ct. 2686. Ordinarily, only circumstantial evidence is available to establish such intent. *See Diaz v. San Jose Unified Sch. Dist.*, 733 F.2d 660, 662 (9th Cir.1984). Evidence of the discriminatory impact of acts, omissions or policies is one sort of circumstantial evidence supporting an inference of discriminatory intent. *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Other circumstantial evidence relevant to the proof of discriminatory intent includes (a) the historical background and sequence of events leading up to the conduct maintaining or exacerbating racial imbalance in the schools, (b) departures from typical procedures or substantive criteria normally considered important by the decision maker, and (c) contemporaneous evidence concerning the decision making process. *See id.* at 267–68, 97 S.Ct. 555.

If a plaintiff succeeds in establishing this prima facie case of intentional segregation, the burden shifts to the defendant to establish that the same segregative conduct would have occurred "even had the impermissible purpose not been considered." *Id.* at 271, n. 21, 97 S.Ct. 555. A finding of intentionally segregative school board conduct in a meaningful portion of a school system creates a presumption that other segregated schooling within the system, likewise, is not the result of some other external causes. *See Keyes*, 413 U.S. at 208, 93 S.Ct. 2686.

### DISCUSSION

There are times when parties choose not to litigate a dispute, but instead choose to negotiate a settlement. By settling, they waive their right to litigate the issues in-

volved in a case, and thus, save themselves the time, expense, and inevitable risks that accompany litigation. This is the path chosen by the parties to this lawsuit. The Proposed Second Revised Consent Decree proffered by the parties is the embodiment of their sustained, good faith efforts to provide for the desegregation of the District and for the equitable treatment of present and future African–American students in the educational process.

The agreement reached embodies a compromise; in exchange for the savings of cost and the elimination of risk, the parties each give up something they might have won or lost had they proceeded with the litigation. The risks of litigation are enormous. For example, the current school desegregation litigation in Rockford, Illinois has been on-going for at least 30 years at a total cost of more than $238 million to the taxpayers of that city—and it is not over yet. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 246 F.3d 1073, 1075 (7th Cir.2001).

A better way must exist to· achieve desegregation and educational equity for African–American children without this enormous financial cost and community discord. And the Court believes that the community of Champaign has found this better way. The Board of Education has harnessed the underlying good will, respect for law, and a sense of fairness existing in the community, to formulate and implement a plan to achieve desegregation and education equity that will be of enduring benefit to all students, African–American and white. While the District has not admitted to any violation of law, either state or federal, it has agreed in an important part of the settlement documents

comprising the Proposed Second Revised Consent Decree that:

1. "The past and current (1968–1997) student assignment system disparately affects African–American students and that remedial action is necessary. Furthermore, the parties agree with respect to the current student assignment system that there are alternative student assignment practices which are of at least comparable soundness and which would not have the disparate impact caused by the present practices." [Champaign Controlled Choice Plan Memorandum of Understanding dated September 16, 1997.]

2. "Data and the results of Dr. Peterkin's audit provide sufficient factual basis to conclude that the District's practices are a substantial cause of conditions which have a significant disparate impact on minority students in Attachment 1, Paragraphs 6 through 13, and that remedial action is necessary. Furthermore, the parties concur that some District practices are not educationally justified or that there are alternative practices available which are of at least comparable educational soundness and which would not have the disparate impact caused by the present practices." [Memorandum of Understanding of Civil Rights Issues Relating to Education Equity, dated July 6, 1998.]

The above jointly agreed findings of disparate impact comprise the factual basis for the remedial actions contemplated by the Proposed Second Revised Consent Decree; however, they do not have the force of litigated findings of fact amounting to violations of law.[11] Although the fact re-

---

**11.** A strong argument can be made that these admissions by the Board of Education may support a violation of federal regulations promulgated pursuant to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 100.3, *et. seq.* These regulations proscribe any use of

federal funds for programs or activities that have the effect of subjecting persons to racial discrimination regardless of the absence of discriminatory intent. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1044–45

mains that past policies and practices of the District have had a significant disparate impact on African–American students, this, in and of itself, is not the sine qua non of unconstitutional de jure (by law) racial discrimination. "The differentiating factor between de jure segregation and so-called de facto segregation is *purpose* or *intent* to segregate." *Keyes,* 413 U.S. at 208, 93 S.Ct. 2686(emphasis added). Different levels of participation in school programs and achievement levels between the races are not necessarily the result of the District's actions. These differences can also be attributed to a host of non-race related factors such as "poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child health care, peer-group pressures, and ethnic culture." *People Who Care* 246 F.3d at 1077. Likewise, disparate student assignments can result from the vagaries of racially identifiable housing patterns within the District. "The board has no legal duty to remove those vestiges of societal discrimination for which it is not responsible." *Id.* "It may have a moral duty; it has no federal constitutional duty." *Id.*

There is one crucial ramification of the difference between litigated findings and agreed findings that must be understood in any assessment of the Proposed Second Revised Consent Decree. Without a finding of racial discrimination, the Court is limited in its ability to order corrective or remedial measures by the District. Even in cases where there is an adjudicated violation, the Court is still constrained by certain equitable principles in ordering relief. Violations of equitable decrees such as this one are punishable as a contempt of court. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205,* 111 F.3d

528, 533 (7th Cir.1997) (citations omitted). Therefore, the Proposed Second Revised Consent Decree should not command the Board of Education to do something that is entirely beyond its control. *See id.* In addition, the Proposed Second Revised Consent Decree must fully consider the interests of innocent third parties, especially when the interests are of constitutional dignity. *See id.* (citations omitted). When a decree is addressed to a branch of government, it must be formulated with sensitivity to the separation of powers and the dignity of States as quasi-sovereigns. *See id.* (citations omitted). Where a decree attempts to reform public institutions, the Court must be sensitive to the practical limitations of the federal judiciary as a super school board administrative body. *See id.* (citations omitted). "[D]ecrees which prohibit specified conduct are preferable to those that impose affirmative duties." *Id.* "[E]quitable remediation must be guided by norms of proportionality." *Id.* (citations omitted). "That is, the remedy must be tailored to the violation, rather than the violation being a pretext for the remedy. Violations of law must be dealt with firmly, but not used to launch the federal courts on ambitious schemes of social engineering." *Id.* Likewise, the parties cannot agree to corrective or remedial measures that depend for their efficacy upon a finding of racial discrimination. Finally, the Court cannot approve a class action settlement "which either initiates or authorizes the continuation of clearly illegal conduct." *Isby v. Bayh,* 75 F.3d 1191, 1197 (7th Cir.1996) (citations omitted).

The parties have presented the Court with an equitable and constitutionally acceptable settlement that allows for the expeditious vindication of the rights of

(7th Cir.1987). The regulations prohibit practices which produce a disparate adverse impact on victims of discrimination where such

practices are not required by educational necessity. *Lucille v. Riles,* 793 F.2d 969, 982 (9th Cir.1984).

African–American children who have been denied, whether intentionally or unintentionally, the equal protection of the law and equal educational opportunity. It is a near certainty that neither side is completely satisfied with the settlement due to the concessions and compromises made by both parties during the course of the negotiations. These painful, drawn-out negotiations have made each party consider the other side's views and positions. This does not imply that either party has shed their respective legitimate responsibilities. Instead, the time spent in the proverbial "shoes" of the other side has enabled the parties to reach a genuine, respectful dialogue to achieve the ultimate goal of reaching a settlement that is fair, educationally sound, and addresses the disparate conditions existing in Unit 4.

The Court, in approving a settlement, need not inquire into the precise legal rights of the parties, nor reach and resolve the merits of the claims or controversy, nor can it impose upon the parties the Court's preference for any specific desegregation plan. *See Evans v. Jeff D.*, 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). It need only determine that the settlement is fair, adequate, reasonable, and appropriate under the particular facts presented and that there has been valid consent by the concerned parties. *See Metro. Housing Development v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir.1980).

Objectors to the Proposed Second Revised Consent Decree have been given reasonable notice and an opportunity to have their objections heard and considered by the Court as part of the November 13, 2001 Rule 23(e) fairness hearing. The only objectors are Herb Stevens and John Lee Johnson[12], two principals in Racial Justice Now ("RJN"), a community-based organization that has its own school desegregation lawsuit pending against the District. For the reasons stated in its Order of August 16, 2001, the Court denied RJN the right to intervene in this case. However, the Court recognizes their history of involvement in fighting for the educational rights of African–American children in the Champaign community and the catalyst role they have played over the years in events leading up to this litigation and proposed settlement. Their observations and concerns about the Proposed Second Revised Consent Decree were welcomed and have received the respectful consideration of the Court. It is fair to say their objections to the Proposed Second Revised Consent Decree reflect their passionate belief that the settlement does not address all of the measures that should be employed to fully desegregate the District and achieve complete educational equity for African–American students. However, the Court cannot prescribe everything the objectors desire since it is cognizant of the constraints on its remedial power under federal constitutional law. In addition, the Court believes that there is virtue in allowing the responsible school authorities to lead the way if they are headed in the right direction and the timetable is reasonable.

It is fair to say that the objectors would like to have the Court oversee the performance of the Board of Education under the Proposed Second Revised Consent De-

---

**12.** One additional party, Paulette Coleman, filed a written objection with the Court on January 3, 2002, long after the November 9, 2001 deadline for filing objections to the Proposed Second Revised Consent Decree. Although untimely, Ms. Coleman's objections are identical to those raised by Johnson and Stevens on the issues of structural displacement and extended commute times. Her objections do not raise any new issues and therefore do not require the Court to address them separately.

cree, to ensure the fulfilment of the intended desegregation and educational equity objectives. However, in the nature of things, it should be, and is, the responsibility of the democratically elected Board of Education to operate the District in a non-discriminatory manner and in accordance with state and federal laws. The Court may have cause to occasionally intervene to keep the train on the track, metaphorically speaking, but not to operate the train itself. In the final analysis, the desire and commitment of the constituent community of Champaign must command and ensure that the Board of Education adheres to the spirit and the letter of the agreement. After all, the continuation of this commitment beyond the expiration of the Proposed Second Revised Consent Decree in the 2008–2009 school year will depend upon the good will and resoluteness of the Champaign community and its elected Board of Education to continue their desegregation efforts and to achieve racial educational equity. Even during the period of Court oversight, an uncommitted Board of Education could sidetrack or derail the metaphoric desegregation train.

The objections of Stevens and Johnson are critical of the Proposed Second Revised Consent Decree in two major respects: (1) dissatisfaction with the manner that it addresses the issue of student assignment, specifically, the structural displacement of African–American students from attending schools within walking distance of their homes; and (2) dissatisfaction with the manner that various educational equity issues are addressed. The Court will address each issue in turn.

### STUDENT ASSIGNMENT

■ As background for any discussion of this issue, one must understand the prerequisites for operating an equitable school system. In this regard, Dr. Michael J. Alves, the Board of Education's nationally recognized school consultant who recommended the adoption of the Controlled Choice Plan to desegregate the Champaign School District, states:

Since the Champaign Community School District is required to educate all the students who are legally enrolled in the School District, it must do so in a way that is fair to all students. *One of the fundamental structural requirements of an equitable school system is that its school buildings have sufficient capacity to accommodate the education needs of all students at each grade and that the capacity is equitably distributed in all areas of the School District.* This prerequisite for operating an equitable school system is especially critical in a school district that has a diverse student population and its residential housing patterns are racially and socioeconomically identifiable. *Another fundamental requirement of an equitable school system is that it has a pupil assignment plan that provides all students with equal access to the District's public schools of enrollment.* An equitable school system also ensures that its pupil assignment plan is organized and managed in a way so that all students are provided access to high quality and instructionally effective public schools. If these prerequisites are met, no students will be denied an equal opportunity to learn because of their race, ethnicity, family income, or where they happen to reside within the School District.

These prerequisites for operating an equitable public school system apply to all school districts at all educational levels including elementary, middle, and high schools. However, they are particularly important at the elementary level when young children may be required to travel long distances to attend a school.

When a school or a group of elementary schools in a particular geographic area are structured in a way so that they

cannot accommodate all the students who reside within walking distance of these facilities, the students who cannot attend these schools must attend other schools that have available space. The students who have been displaced from schools within walking distance from their homes must also be transported to schools that have available space. Moreover, when students have been structurally displaced from schools within walking distance from their homes and the school district also has racially and socioeconomically identifiable housing patterns, the burden of having to be assigned and transported to schools that parents may or may not want their children to attend will disproportionately affect students with similar demographic characteristics. *The problem of structural displacement most often occurs when a school district has not provided sufficient capacity in the schools that are located in the most densely populated areas of the community.* This situation, which can be readily addressed, is particularly inequitable when a student's home address is or may be a determining factor in the District's student assignment policy and when students who reside in more affluent and less densely populated areas have sufficient capacities in schools near their homes. (emphasis added) [Report on the Status of Structural Displacement in the Champaign Community School District by Michael J. Alves, October 2001.]

Prior to 1997, Champaign had a significant problem with racially identifiable schools, particularly in the heavily African–American north side. To rectify this imbalance prior to the adoption of the Controlled Choice Plan in 1997, the District adopted a desegregation plan that forced the mandatory busing of African–American students in the north side to schools in the south side. The District's plan was motivated in part by the shortage of capacity in the north. In this light, Stevens and Johnson do not view the current Controlled Choice Plan as an equitable solution due to the persistent shortage of elementary seats in the north. Therefore, they argue that there be a short timetable for the provision of sufficient seating capacity in the schools located in north Champaign and particularly, in the areas encompassing the African–American community to allow those African–American students living there to attend elementary schools within walking distance of their homes. They also request that north side schools be designated as "special learning centers" with increased budgets and extended class hours and that African–American students attending south side schools have access to programs and resources to meet their perceived special learning needs.

Stevens and Johnson contend that the Controlled Choice Plan, as implemented, has not eliminated or significantly reduced the one-way busing of African–American students to schools in distant parts of south Champaign, thereby depriving them of the privilege afforded white students residing in south Champaign to attend schools within walking distance of their homes. They attribute this failure to the lack of adequate seating capacity in north Champaign and further argue that segregation throughout the District has actually increased under the Controlled Choice Plan. According to Stevens, three of the four north side elementary schools, Stratton, Washington, and Garden Hills, have become racially identifiable since the implementation of the Controlled Choice Plan in 1998. Stevens also contends that the fourth school, Dr. Howard, is tending toward this result. These observations, if accurate for all grades in the District, do not accurately reflect the results of implementation of the Controlled Choice Plan,

which has only been implemented in grades K–3 as of this date.

While the Court appreciates Johnson and Stevens' concerns regarding the structural displacement of African–American students in Champaign, the Court believes that their observations are misleading as to the effects of the Controlled Choice Plan. Under the provisions of the Plan, enrollment is open at all schools so long as the racial composition of the school does not violate the racial fairness guidelines. Accordingly, schools must compete against one another to attract students to attend. Under these circumstances, it is not surprising that a number of African–American students may have chosen to take buses to the south side in order to take advantage of what are widely perceived to be superior schools. In this regard, Dr. Alves concluded, after reviewing the relevant data, that no African–American student had been denied access to his/her proximity A school because of the racial fairness guidelines. His conclusion is further buttressed by the fact that less than 21 percent of the students living within Stratton's proximity A area selected it as their first choice school. Of all the African–American students that did so, all were assigned to Stratton. Only 17% of the students in Washington's proximity A area selected it as their first choice school and all who did so were assigned. Similarly, only 35% of the students living in Garden Hills' proximity A area chose it as their first choice and all were assigned. By contrast, 97% of the students residing in Barkstall's proximity A area chose it as their first choice. Such figures strongly suggest that the schools in the north side are not as attractive as those in the south side. This, in turn, compels the Court to conclude that African–American students are *voluntarily* choosing to bus to attend the more attractive south side schools, as opposed to being forced to bus due to the lack of capacity at their proximity A schools. In-deed, it appears that the status of north side schools involve issues beyond insufficient capacity and implicate the educational equity issues addressed *infra*.

The Proposed Second Revised Consent Decree recognizes the continued problem of structural displacement and provides for its elimination in the following manner:

1. the fourth strand of classes at Stratton Elementary School will be open for enrollment by the start of the 2003–2004 school year;

2. by the start of the 2005–2006 school year, additional net seating capacity of not less than two elementary strands in north Champaign will be provided as part of a comprehensive facilities plan for the entire district; and,

3. in making all decisions regarding the establishment or closing of schools, the Board of Education will consider the impact on African–American students and to further desegregation and to avoid inequitable transportation burdens on African–American students, consider all reasonable alternatives to enhance desegregation efforts that do not result in a segregated system or segregated schools.

The Court interprets these clauses to mean that the District will increase seating capacity in north Champaign by at least 260 net seats within the next five years. The Court anticipates, however, that the Board of Education will go beyond the requirements of the Proposed Second Revised Consent Decree in its efforts to increase seating capacity during this period. For example, although not required, the Court would expect the Board of Education to seriously consider utilizing the classrooms vacated at Marquette School, when the preschool program is transferred to the old Sunbeam Bakery, to add additional seating capacity. During negotiations, the parties recognized the legitimate

concern of the Board of Education for flexibility in deciding how it can achieve the most desegregation "bang for the buck." The Court trusts their good faith in doing so. In connection with the construction of any new schools, the continued need to equalize seating capacity throughout the entire District, with particular consideration of the seating needs of the schools where a majority of African–American students live, will be a major factor in school location. This commitment is buttressed by the requirements of state law that requires the Board of Education to construct and locate school buildings to facilitate the further desegregation of the School District. Under the Illinois School Code, the Board of Education is under a continuing duty to periodically "change or revise existing [attendance] units or create new units in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality." 105 ILCS 5/10–21.3.

In addition, increasing the seating capacity of the north side will partially aid in alleviating the commuting times suffered by African–American students. The District has also retained the services of Craig Mitchell, an expert on transportation issues, to shorten the time spent by African–American students who choose to bus to the south side. The Court notes that the District has made a substantial investment in routing software as well.

The Court understands the objectors' impatience with a delay of several years to completely solve the structural displacement problem. On the other hand, progress is being made voluntarily, and the Court has faith in the sincerity and expressed commitment of the Board of Education to correct the seating shortage in north Champaign before any new schools are constructed in south Champaign. In settlement talks before the Court, each side pleaded with the other for trust and belief in the sanctity of their respective commitments under the Proposed Second Revised Consent Decree. Each side sought to persuade the Court of their righteousness. The Court accepted their words and expects the parties to live up to the letter and spirit of the Proposed Second Revised Consent Decree.

## EDUCATIONAL EQUITY ISSUES

■ Mr. Stevens seeks a requirement that there be an annual budget for making "Equity Agreement" reforms, that the decree's permanent monitor be required to look closely at hiring practices to recruit more African–American teachers, and that the District be required to improve its remedial offerings. Johnson voices concerns that the Proposed Second Revised Consent Decree would void the June 5, 1998 Resolution Agreement between the Board of Education and OCR.

Addressing these concerns, the District has taken several steps: creating a budget for making the proposed educational equity reforms, substantial improving its hiring practices, and pledging to rigorously examine and evaluate its remedial offerings. In addition, the Proposed Second Revised Consent Decree expressly adopts and incorporates the June 5, 1998 Resolution Agreement between the Board of Education and OCR. Accordingly, it appears to the Court that Stevens and Johnson do not have any objections to the manner in which the Proposed Second Revised Consent Decree addresses the educational equity issues of the Champaign School District. Instead, what their objections voice is a deep-seated distrust of the intentions and good faith of the Board of Education. Their skepticism in this regard is based upon their assessment that during the three years the Controlled Choice Plan has been in operation, structural displacement

has increased in certain north side schools, and many of the schools—north and south—are out of compliance with racial fairness guidelines. They blame this failure squarely on the Board of Education's reluctance to mandatorily bus white students residing in the south side to north side schools. Accordingly, they point to the "oneway" busing of only African–American students as proof that the Controlled Choice Plan has been corrupted by the Board of Education. The only exceptions are those white children bused to schools in north Champaign providing enhanced education in gifted classes, which are self-contained and isolated from the regular classrooms. However, Stevens points out that African–American students constitute only 41 out of the 258 students enrolled in these gifted program. As mentioned earlier, the Court questions the accuracy of attributing these district-wide conditions to the Controlled Choice Plan, which has only been operating in the first three grades as of this date.

Upon closer examination, Stevens' and Johnson's objections display a fundamental misunderstanding of the principles of the Controlled Choice Plan. As the Court stated earlier, controlled choice is predicated upon open competition between schools for students. Schools with better academic programs will naturally draw more students than those with inferior academic programs. This, in turn, offers an incentive for underperforming schools to upgrade their curricula, staff, and facilities to compete with their brethren. To assist under-chosen schools, the District has committed to provide resources to facilitate school improvement. The net result is a continuous cycle of competition and improvement in the overall quality of education as students are granted access to high quality schools outside their immediate neighborhood area. Given a choice, it is completely understandable that parents would decline to send their child to an inferior academic institution when better alternatives are readily available. This is borne out by the fact that only a low percentage of African–American students residing in the north side choose their proximity A school as their first choice. Stevens' figures rely solely on head counts without taking into account any underlying circumstances for the lack of popularity of north side schools among both African–American and white students.

Moreover, the existence of special gifted programs in the north side schools offers an example of how certain programs can voluntarily draw non-African-American students to north side schools. By strengthening the academic programs offered, north side schools can offer compelling reasons for students, both African–American and white, to choose their facilities. In regard to the racial composition of the north side gifted programs, it is true that only 41 of the 258 students enrolled are African–American, which works out to roughly 16%. Stevens objects to this as being too few. While the numbers are still low in relation to the overall percentage of African–American students district-wide, the Court notes that the District has made substantial strides in improving minority enrollment in gifted programs. Indeed, the percentage of elementary level African–American students enrolled in the gifted programs during the 1996–1997 school year stood at a mere 2.7%.

In light of the substantial strides the District has made since 1997 in addressing its school assignment and educational equity issues, the Court accepts the professed good faith of the District's commitment to implement the Proposed Second Revised Consent Decree.

### CONCLUSION

IT IS THEREFORE ORDERED THAT the parties Joint Motion for Ap-

proval of the Proposed Second Revised Consent Decree [Doc. # 41] is ALLOWED.

## SECOND REVISED CONSENT DECREE

1. In May and July 1996, the United States Department of Education, Office of Civil Rights ("OCR"), accepted complaints by several families ("OCR complainants") that addressed mandatory one-way busing of African–American students and the educational services provided to those students by Champaign Community Unit School District No.4 ("Unit 4").

2. In September 1996, OCR initiated a proactive compliance review of Unit 4 in the areas of over-representation of minorities in special education and under-representation of minorities in upper level courses.

3. In October 1996, the OCR complainants, by their counsel Futterman & Howard, Chtd., amended their complaints to include additional allegations of system-wide discrimination in student assignment, within-school segregation practices and tracking, discipline, and staffing.

4. Shortly thereafter, OCR incorporated the allegations of the OCR complainants into the proactive review.

5. Following a period of study and community input, the Board of Education of Unit District No.4 ("Board") in November of 1996 established a redistricting plan ("Redistricting Plan").

6. The OCR complainants asserted that the Redistricting Plan did not fully resolve their complaints, and that the Unit 4 student assignment system required additional modifications to ensure diversity and educational equity, and to reduce the disparate impact of educational practices.

7. Accordingly, in or around May 1997, Plaintiffs, both the original OCR complainants and additional class representatives of African–American students, represented by counsel from Futterman & Howard, notified Unit 4 that they were contemplating the commencement of class action litigation against the District challenging, among other things, the student assignment methods used from 1968 to 1997 and those provided in the Redistricting Plan.

8. On September 16, 1997, Unit 4 and Plaintiffs entered into an agreement memorialized in the Champaign Controlled Choice Plan Memorandum of Understanding ("Controlled Choice Memorandum"), which established a comprehensive plan that enables parents, within certain parameters, to choose the schools their children will attend. The Controlled Choice Memorandum is hereby incorporated as part of this Consent Decree and is attached hereto as Exhibit A.

9. In June 1998, OCR and Unit 4 entered into a Resolution Agreement ("OCR Resolution Agreement") as to the actions appropriate for resolving issues covered in the agency's review. The OCR Resolution Agreement is hereby incorporated as part of this Consent Decree and is attached hereto as Exhibit B. The OCR Resolution Agreement includes findings of fact by OCR that established statistical disparities between majority and minority students in the areas of gifted, upper level courses, within-school integration, discipline, and special education. The Board neither admits nor denies OCR's factual findings.

10. In conjunction with the OCR Resolution, the parties agreed that more detailed comprehensive analysis was needed to establish the necessary factual predicates required to remedy equity disparities. Accordingly, the District retained an educational equity consultant, Dr. Robert Peterkin, to perform a comprehensive equity audit ("Audit"). The Audit is hereto attached as Exhibit C.

11. On July 6, 1998, Unit 4 and Plaintiffs entered into further agreement, memorialized in the Memorandum of Understanding of Civil Rights Issues Relating to Education Equity ("Education Equity Memorandum"), which established a comprehensive plan and program for addressing certain additional complaints of Plaintiffs regarding the alleged inequitable treatment of African–American students in Unit 4 schools and programs. The Education Equity Memorandum is hereby incorporated as part of this Consent Decree and is hereto attached as Exhibit D.

12. The Education Equity Memorandum specifically required the parties to develop a clear process and a detailed and effective plan ("Implementation Plan") to achieve educational equity for African–American students. *See* Education Equity Memorandum (Exhibit D), Paragraphs 2B and 5A–H. The Implementation Plan was approved by the Board on June 12, 2000. It will be continually monitored and may be modified in the future as appropriate. The Implementation Plan is hereto attached as Exhibit E.

13. The parties chose to address Plaintiffs' allegations regarding educational inequities cooperatively because there were substantial advantages to both Unit 4 and the Plaintiff class in terms of the speed and potential effectiveness of the remedies and because there was a significant and valuable possibility that there would be greater community support for the equity efforts, which in turn would contribute to the effectiveness of the remedial efforts.

14. As a part of the Controlled Choice and Education Equity Memoranda, the parties agreed that in the event that objections or challenges were raised by a third party regarding the lawfulness or appropriateness of the Memoranda or the implementation of the Memoranda, the District and the Plaintiff class, as represented by Futterman & Howard, would jointly defend the lawfulness and appropriateness of the matter challenged.

15. On July 28, 2000, such a third party challenge was made. *See RJN v. Board of Education of Champaign,* Case No. 00–2022, filed in the Central District, Urbana Division and reassigned to the Peoria Division with a new Case No., 00–1284.

16. Accordingly on October 4, 2000, Plaintiffs, as representatives of the class of present and future African–American students in Unit 4, filed their Complaint against the Board of Education of Unit 4. The Complaint alleges that Unit 4's educational practices violate the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964, 34 C.F.R. § 100.3 *et seq.,* 42 U.S.C. § 1981, and the Equal Protection Clause of the Illinois Constitution. Plaintiffs believe that if their Complaint was litigated, there is a substantial likelihood that they would succeed in the merits of their claims.

17. On December 18, 2000, this Court consolidated this case with RJN v. Board of Education.

18. On December 28, 2000, Racial Justice Now ("RJN") filed a motion to intervene into this case. This Court denied the motion to intervene on August 16, 2001.

19. On February 8, 2001, Unit 4 filed its Answer to the Complaint in this case.

20. On August 22, 2001, this Court granted class certification to the Johnson plaintiffs, appointed Futterman & Howard class counsel, and vacated its December 18 order consolidating the RJN and Johnson cases.

21. The parties agree that there are alternative student assignment and educational practices, reflected in the Controlled Choice Memorandum, Education Equity Memorandum and Implementation Plan, which are of at least comparable soundness and which would not have the

disparate impact caused by the practices used by Unit 4 from 1968 to 1997. The parties agree that adoption of these alternatives will benefit all students.

22. The Board believes that litigation of these issues would require a substantial expenditure of public funds and a substantial commitment of Board and staff resources at a time when financial and personnel resources are already greatly limited, and that such resources can more appropriately be used to achieve the educational goals of the school system. The parties further believe that litigation in this matter would be protracted and that settlement of the action is in the public interest.

23. In light of these considerations, the parties, as indicated by the signatures of their counsel on the Joint Motion for Preliminary Approval of the Revised Proposed Consent Decree, have determined to settle this action and resolve Plaintiffs' request for injunctive and declaratory relief by entry of this Consent Decree. The parties submit to the jurisdiction of this Court and acknowledge that subject matter jurisdiction exists over this action under the Fourteenth Amendment of the United States Constitution and under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The parties further acknowledge this Court's pendant jurisdiction over Plaintiffs' claims under the Equal Protection Clause of the Illinois Constitution, Ill. Const. Art. I, Sec. 2. In light of the claims in this case and the scope of remedies which this Court would be authorized by law to enter if there were a finding of a liability on those claims, the parties concur that all of the provisions of this Order are within the scope of such remedies and, therefore, are consistent with the Constitution and laws of the United States.

24. The parties agree that this Consent Decree is final and binding as to the issues resolved herein. The Court shall retain jurisdiction over this action for the purpose of enforcing the dispute resolution procedure set forth in Section IV of the Consent Decree entitled "Resolution of Disagreements." If any provisions are found by a court to be outside the scope of constitutional or statutory remedies, it is the express intention of the parties that such provisions are severable from all other provisions. Finally, considering the judicial resources that might be conserved by resolving in this fashion the issues addressed herein, the parties believe that this Order represents an appropriate commitment of the Court's resources.

25. In the event that any other objections or challenges are raised by third parties (e.g., through intervention or separate collateral lawsuits) to the lawfulness or appropriateness of this Consent Decree, any provision hereof, or proceedings pursuant hereto, or that attempts are made to separately litigate these issues, the parties shall jointly defend the lawfulness and appropriateness of the matter challenged. Unit 4's counsel will take the lead role in doing so. If any such collateral lawsuit arises in state court, the parties shall seek to remove such action to the U.S. District Court.

The parties having freely given their consent to the terms of this Consent Decree and in accordance with the findings of fact and conclusions of law contained in the Order entered concurrently herewith, it is ordered:

## I. CONTROLLED CHOICE PLAN

In accordance with the Controlled Choice Memorandum (see Exhibit A hereto attached), Unit 4 will continue to implement the requirements of the Controlled Choice Memorandum, unless subsequently amended by agreement of the parties. The parties agree that Controlled Choice at the middle and high school levels will

not be instituted unless Plaintiffs demonstrate by March 15, 2002 [1], after consultation with Dr. Alves, that Controlled Choice is necessary to fulfill the objectives of the Consent Decree. The Controlled Choice Plan for the elementary school level shall continue to include all the enumerated elements set forth in the Controlled Choice Memorandum, unless otherwise agreed, including, without limitation, the following elements:

A. *Parent Information Centers*

1. Establish, maintain and administer a Parent Information Center as further described in the Controlled Choice Memorandum.

B. *Application and Assignment*

1. Administer the application and assignment process for its schools in a manner consistent with the Controlled Choice Memorandum, including, without limitation, those procedures set forth in the Controlled Choice Memorandum for student selection at over-enrolled schools.

C. *Magnet Schools*

1. Establish and maintain a program of magnet schools, and shall provide for interest-based application to and heterogenous attendance at such schools as provided in the Controlled Choice Memorandum.

D. *Seat Capacity*

Unit 4 will complete the following steps to increase seat capacity and enhance student assignment desegregation:

1. Consistent with Paragraph G(4) below, open and enroll the fourth strand of classes at Stratton Elementary School by the start of the 2003–2004 school year.

2. Secure funding and complete the renovation of the old Sunbeam Bakery by the end of the 2002–2003 school year, contingent on receipt of Qualified Zone Academy Bonds from the Illinois State Board of Education, and relocate the pre-school program currently located at Marquette School to the renovated Sunbeam Bakery building.

3. By the start of the 2005–2006 school year, provide additional net seating capacity of not less than two elementary strands in north Champaign as part of a comprehensive facilities plan for the entire District. Unit 4 will make every good faith effort to find and obtain necessary funding as a condition of this commitment.

4. In making all decisions regarding the establishment or closing of schools, consider the impact on African–American students, and to further desegregation and to avoid inequitable transportation burdens on African–American students, consider all reasonable alternatives to enhance desegregation efforts that do not result in a segregated system or segregated schools.

E. *Community Involvement*

1. Consult with and solicit the participation of members of the community in the implementation of the Controlled Choice Plan, including the Controlled Choice Community Task Force established pursuant to the Controlled Choice Memorandum.

F. *Other Activities*

1. Carry out those additional activities as set forth in the Controlled

---

1. In the event that Dr. Alves' report on secondary school choice is not completed by January 15, 2002, Plaintiffs must demonstrate the need for secondary school choice within 60 days from the date of Dr. Alves' report.

Choice Memorandum as shall be necessary to effectuate the Controlled Choice Plan, including without limitation the provision of appropriate transportation services, implementation of school reform activities for the support of both over-chosen and under-chosen schools, and continued provision of special services and funding for eligible students under State and Federal law.

G. *Plan for Stratton Elementary School*

Given the historical circumstances faced by Stratton Elementary School, which are detailed in the Findings of Fact supporting this Decree, Stratton shall be designated as a special desegregation school. A five-year plan for Stratton will be developed and will include, but is not limited to, the following elements:

1. The District will provide educational input programs, requiring additional resources and funds, that will endeavor to accelerate student learning and increase parental involvement and advocacy, including maintaining an average student/teacher ratio not to exceed 20 to 1.

2. Stratton will be closely monitored by a special Building Council of administrators, parents, staff, and community members who will provide input to the principal regarding improvement of student achievement, including recommendations regarding programs, services, and staff. The Superintendent and Assistant Superintendent, Equity and Education, will work with Plaintiffs' and Defendant's counsel as necessary to monitor these issues.

3. Unit 4 will launch a recruitment campaign for Stratton focusing on increasing racial and socioeconomic diversity of the student body.

4. Stratton, while not exempt from racial fairness guidelines, will have a five year time frame to attain racial fairness guidelines, and is expected to make incremental progress during that time.

II. *EDUCATIONAL EQUITY PLAN*

Unit 4 will carry out the requirements of the Educational Equity Memorandum (*see* Exhibit D hereto attached), unless subsequently amended by agreement of the parties. In accordance with said Memorandum, Unit 4 will carry out the Implementation Plan (*see* Exhibit E hereto attached) which was prepared, in part, based on the comprehensive Audit conducted in June 1998 with the assistance of external consultants to evaluate the performance of Unit 4 schools (*see* Exhibit C hereto attached). The Implementation Plan is to address those issues identified in the Educational Equity Memorandum in accordance with the following goals:

A. *Climate and Discipline*

1. Seek to provide educational tools and alternative resources that eliminate unwarranted disparities in student discipline and attendance at alternative schools.

2. Seek to use student discipline as an intervention strategy only and as a means to improve student performance and academic behavior.

B. *Special and Gifted Education Programs*

1. Seek to eliminate, to the greatest extent practicable, unwarranted disparities in the assignment of minority students to special education and gifted programs, and to operate such programs in an educationally sound and nondiscriminatory manner.

C. *Student Performance*

1. Seek to eliminate unwanted disparities in the enrollment of minority students in upper level courses.
2. Implement innovative, interactive, research-based curriculum and instructional practices that take into account students' diverse learning styles and provide training to teachers in such practices.

D. *Hiring and Staff Placement and Retention*

1. Seek to achieve a substantial level of racial diversity of certified and classified staff District-wide and at each school level in order to facilitate educational equity.

III. *TIMETABLE*

The Controlled Choice Plan and the Educational Equity Plan will be developed and implemented in accordance with the schedules set forth in the Controlled Choice Memorandum and the Educational Equity Memorandum, respectively. Currently, the initiatives are in their fourth year of an eleven-year implementation schedule, which will expire at the end of the 2008–2009 school year. The District's obligations under this Decree likewise will expire at that time.

IV. *MONITORING AND ENFORCEMENT*

A. *Monitor*

Dr. Robert Peterkin was originally retained by Unit 4 to review equity issues and co-authored the Equity Audit (attached as Exhibit C). In accordance with Federal Rule of Civil Procedure 53, the inherent equitable powers of this Court, and the provisions of this Order of reference, Dr. Peterkin is hereby ordered to serve as monitor in this case. The Court-appointed monitor will provide valuable information and expertise to the Court regarding implementation of the Decree.

The monitor will work cooperatively with Unit 4 and the Plaintiffs in order to assure full implementation of the components of the Decree with adherence to the timetables and goals therein. The monitor will submit annual written progress reports, including any recommendations, to the Court, the District and the Plaintiffs' counsel on approximately the first day of August of each year, beginning August 2002. To facilitate timely submission of reports to the Court, the monitor may collaborate with data specialist James Lucey and student assignment expert Dr. Michael Alves. If either James Lucey or Michael Alves becomes unavailable, the parties will agree on another individual. These reports will include data and documentation of the elements of the Controlled Choice Memorandum, Education Equity Memorandum and Implementation Plan, consistent with the requirements of the status reports to be submitted to the United States Department of Education, Office of Civil Rights ("OCR") as part of the OCR Resolution Agreement (attached as Exhibit B) and to the Planning and Implementation Committee as part of the Controlled Choice and Education Equity Memoranda. The monitor will compile data on a semester basis, beginning with data for the Spring 2002 semester. As appropriate, the monitor may make recommendations to Unit 4 each semester. If Dr. Peterkin becomes unavailable to serve as the monitor, the parties will agree on another individual, and submit his or her name to the Court for approval.

B. *Mediator*

Although this Court retains jurisdiction to inquire into and compel the implementation of the Consent Decree as it deems necessary, the monitor's role will also include mediating any disputes between the parties regarding any component of the Decree. The purpose of this mediation

process is to promote cooperation between the parties, encourage voluntary compliance by the District, and limit unnecessary expenditures of this Court's time and resources. In order to initiate the mediation process, disagreements regarding any component of the Controlled Choice Plan and the Educational Equity Plans, must be submitted in writing by either party to this Decree to Dr. Peterkin, who will have one month to issue a decision.

### C. *Arbitrator*

If the parties are unable to resolve the issue with the assistance of the monitor, the issue shall be resolved by binding arbitration before an arbitrator, as provided in the Controlled Choice and Educational Equity Memoranda (*see* Exhibits A and D hereto attached), except the parties agree that there will not be a permanent arbitrator. The arbitrator for any given issue(s) will be mutually agreed upon by Plaintiffs and Unit 4. In the event the parties are unable to agree on an arbitrator for any give issue(s), each party will choose an arbitrator and these individuals will choose a third person who will serve as the arbitrator. Any arbitration award rendered under the Decree shall be enforceable by this Court.

### V. *CHANGES TO THE CONSENT DECREE*

If extenuating circumstances arise regarding any component of this Consent Decree, the parties, with the assistance of the monitor, may jointly propose appropriate changes in writing to the Court.

### VI. *FUNDING*

Consistent with Paragraphs 17 and 7 of the Controlled Choice and Educational Equity Memoranda, respectively, the District has agreed to provide sufficient resources for the implementation of this Consent Decree.